MAX N. TOBIAS, JR., Judge.
_JjThe defendants, Deloyd “Puggy” Jones (“Jones”) and Alton “Peewee” Augustin (“Augustin”), were each charged and convicted of two counts of attempted second degree murder and were each sentenced to forty years at hard labor, without benefit of parole, probation, or suspension of sentence, on each count, with the sentences to be served consecutively as to each defendant. For the reasons that follow, we affirm the defendants’ convictions and sentences.
Jones and Augustin were each charged by grand jury indictment on 17 November 2011, with two counts of attempted second degree murder, violations of La. R.S. 14:(27)30.1. The defendants entered pleas of not guilty at their 28 November 2011 arraignment. On 5 December 2011, a twelve-person jury was selected for trial, and the remainder of the trial continued to 7-9 December 2011. Both defendants were found guilty as charged on 9 December 2011. On 1 March 2012, the trial court denied the defendants’ motions for new trial. The defendants evidenced their readiness for sentencing, and the trial court sentenced each of them to forty years at hard labor on each of the two counts, without benefit of parole, probation, or suspension of sentence, and with both sentences to run consecutively |2as to each defendant. The trial court denied Augustin’s motion to reconsider sentence on 11 May 2012. This timely appeal followed.

FACTS

Augustin and Jones were both convicted on 23 February 2010 of two counts each of attempted second degree murders of Lu-cious Baker and Bessie Rogers.
New Orleans Police Department (“NOPD”) Crime Lab technician Emily Martinez processed the crime scene in the 1400 block of Gallier Street in New Orleans on 23 February 2010. She recalled that the dispatch signal was an aggravated battery by shooting and she arrived at the scene at 1:53 p.m. Ms. Martinez identified her report in the case, State’s Exhibit One. Upon arrival at the scene, she observed cartridge casings at the scene and later determined that three residences had been struck by bullets — 1407, 1403 and 1321 Gallier Street. She identified some photographs of the crime scene, among the 103 she had taken there. She admitted that she could not say that any bullets that struck the three residences came from any spent cartridge casings found at the crime scene.
“Joselin” Darrensbourg testified that she was babysitting a two-to-three-year old child at a friend’s residence at 1321 Gallier Street on 23 February 2010. A bullet came through the residence. She and the child got on the floor. She heard only one shot and did not see who did the shooting. Approximately ten minutes later police rang her doorbell. She replied in the negative when asked on cross examination whether prior to that date she had seen any empty cartridge/shell casings in the street in that area. She did not examine the exterior of the residence before going inside that day. She replied in the negative when asked on cross examination *1068 whether she heard any car doors opening or shutting or heard anyone screaming out the names Deloyd, Alton, “Puggy,” or “Peewee.”
|RLisa Rayfield testified that on 23 February 2010 she was living at 1403 Gallier Street. A male she had seen in the neighborhood got shot. He ran through her alley and into her back door. Ms. Rayfield identified photographs depicting blood on the floor and back porch of her residence, bullet holes in her door, and bullet holes in her living room wall. When asked if she had seen who was doing the shooting, Ms. Rayfield stated that she did not, and she volunteered that she did not see what color car it was — even though no car had been mentioned insofar as her testimony was concerned. She asked the victim who shot him, and he told her he did not know. Her daughter alerted her to the sound of gunshots. She did not hear any car doors opening, shutting, or slamming. She did not hear anyone outside screaming the names Deloyd, Alton, “Puggy,” or “Peewee.” She said the victim was able to talk to the paramedics that came.
Gladys Rayfield testified that she had lived at 1401 Gallier Street since 1996. She resided with her mentally handicapped nephew, Louis, who was then sixty-one years old. Her daughter, Lisa Rayfield, lived in the other half of the double residence, at 1403 Gallier Street. On the day of the shooting Ms. Rayfield was sitting on the side of her bed when a bullet came through the mailbox. She jumped up, pushed Louis to the floor, and got on top of him. She did not see anything, including anyone shooting or any cars driving by-
Stephanie Ezidore testified that she was a New Orleans Police Department (“NOPD”) 911 police complaint operator in, and custodian of records for, the Communications Division. She identified an incident recall under NOPD item # B-27635-10 and a CD of the 911 call reflected by the incident recall. The 911 call was played aloud for the jury. On cross examination Ms. Ezidore stated that the |4kind of car utilized in the reported incident was a Dodge Charger, but no one identified the shooter or the number of shooters involved.
Bessie Rogers testified that she resided at 1407 Gallier Street. On the day of the incident she was sitting at her kitchen table at approximately 12:45 or 1:00 p.m. when she heard continuous shooting. She stood up and went around towards a hallway, at which point she was struck by a bullet. She identified photos of bullet holes in her front door, a common interior bathroom/bedroom wall, and marks across the ceiling in one room where bullets had skimmed the ceiling. She stated on cross examination that she sustained a superficial wound. Ms. Rogers did not see the shooters or their vehicle, nor did she hear anything besides the gunshots.
Lucious Baker testified that he was going to “drug court” on 23 February 2010 as part of a plea deal (he admitted to having been previously convicted of possession of cocaine). He was walking to catch a bus near his home when a white Dodge Charger automobile came up the street, and someone inside the car began shooting at a male in what he guessed was the 1500 hundred block of Gallier Street. (He was living at 1408 Gallier Street at the time.). Mr. Baker stopped, looked for a minute, and when he realized shots were coming toward him, he ran around a house and hopped a gate. Mr. Baker testified that Augustin, whom he knew as “Peewee,” was in the front passenger seat of the white Charger, while Jones, whom he knew as “Puggy,” was in the rear passenger seat. He said one had an assault rifle and one had a handgun. He thought Jones had the *1069 assault rifle and Augustin had the handgun. He said they were hanging out of the window of the ear shooting at him. He was struck in his hand and his foot as he went over the gate. After he hopped the gate, they stopped in front of it and started shooting some more. Jones got out of the car, ran up to the fence with the assault rifle, and | r,started shooting at the ground when Mr. Baker fell and was crawling. He went to the back of that residence, and a lady named Lisa let him in through her back door.
Mr. Baker testified that Detective Mary Colon asked him at the scene who shot him, before he and Mrs. Rogers were put in an ambulance and transported to University Hospital. Detective Colon later came to the hospital and showed him two photo lineups in which he identified Jones and Augustin as the shooters. He had described both defendants to the detective as having the numeral “8” tattooed in the middle of their foreheads. He had further described Jones as wearing a black hat and black t-shirt, and Augustin as having dreadlocks and wearing a black t-shirt. He estimated that he had known Jones for a couple of years, through Jones’ brother. He had known Augustin for about four years, just from seeing him around. However, on cross examination Mr. Baker admitted that there was a relationship between one of his relatives and Augustin. He also confirmed that he would have known before the shooting of any tattoos Augustin might have had.
Mr. Baker said he was released from the hospital on 26 February 2010, three days after he had been shot. Mr. Baker admitted that when an assistant district attorney (“ADA”) later came to his home with a detective, the ADA showed him the photo lineups that he, Baker, had signed, identifying defendants as the shooters. Mr. Baker testified that he told the ADA those were not the perpetrators. He said he did not want to have anything to do with the case because he did not want to bring trouble to his home and his family. He said he asked the ADA why he kept bringing the police to his house, mentioning that they acted like they were trying to get him killed. He noted that someone in the next block kept seeing them coming to his house. He said that a year later the ADA returned and told him that the charges had been picked up. He said he was arrested when he went to drug court | f,and stayed in jail a week. He said that after-wards he met with that same ADA, who asked him to testify before the grand jury. He also met with District Attorney Leon Cannizzaro, who told him to do the right thing. He subsequently testified before the grand jury that the defendants shot him.
Mr. Baker testified that after testifying before the grand jury he came into contact with Augustin’s mother, who asked him to sign an affidavit. She took him to the office of Augustin’s attorney, and he signed an affidavit stating that “John-John” and “Maurice” had shot him. He got those names from Augustin’s mother. He said Augustin’s mother offered him $4,000 to sign the affidavit. He said he did not want the money; he just wanted to get it all over with because he was putting his and his family’s lives in jeopardy. He said he did not come to court on the morning the case was set for trial because he was stuck at his grandmother’s home. He said he was subsequently arrested on a warrant and had been in jail on the warrant for two months. He never got any money for signing the affidavit because he did not want the money.
Mr. Baker admitted on cross examination that he had testified before the grand jury that he was getting ready to get into his brother’s car to go to drug court when *1070 the shooting occurred. He admitted that was not true, but denied that he lied to the grand jury, saying that he was just trying to get out of jail, where he had been for approximately seven days preceding his grand jury appearance. He admitted that he was in pain in the hospital when Detective Colon came to see him, and that he had been prescribed morphine for pain. Mr. Baker conceded that in fact he had been discharged from University Hospital on the day of the shooting, but he said he had gone back into the hospital — explaining why he had testified on 17direct examination that he got out of the hospital three days after the shooting, on 26 February 2010.
Mr. Baker said the white Charger was going a little fast. He did not see the driver’s face. He said the windows were tinted. He was looking back as he ran. He denied that the woman whose house he ran into asked him who shot him. When asked if the shooting had lasted probably thirty seconds, Mr. Baker replied “[sjome-thing like that.” He said that he had never used cocaine or any drugs whatsoever. He , admitting to twice failing drug screenings for alcohol and cocaine in his system, but reiterated that he had never used cocaine.
With regard to the affidavit Mr. Baker executed in the office of Augustin’s defense counsel, he replied in the affirmative when asked on cross examination whether defense counsel had taken the time to listen to his story before preparing the affidavit. Mr. Baker agreed that Augustin’s counsel showed surprise when Mr. Baker indicated two totally different people as the shooters. Defense counsel introduced the affidavit into evidence. Mr. Baker said he lied when he put in the affidavit that Au-gustin was not involved in the shooting. He admitted seeing Augustin’s mother give Augustin’s counsel money for Augus-tin’s defense, but not to pay him, Mr. Baker, for anything. Mr. Baker testified that he never said that counsel was going to give him any money. He stated that an ADA told him to tell the truth. After he consulted with an attorney, he took the witness stand and asserted his right against self-incrimination.
Mr. Baker admitted that he did not appear for a prior trial date, even though he had been subpoenaed to do so. He said he had been in Baton Rouge and had no way to get to court from there. He admitted that he was subsequently arrested and that he had been in jail for approximately two months at the time of the instant | atrial. He replied in the negative when asked whether he had been given immunity by the state or whether they told him he would not be prosecuted if he told the truth. Mr. Baker admitted previously testifying in another section of court as a witness. He admitted that he was supposed to have been a material witness in that case also, and in fact that he had also executed an affidavit in that case. Mr. Baker also admitted that he had also claimed that an attorney was supposed to give him money in the other case. He later heard on the street that the defendant in that case was found not guilty.
Mr. Baker admitted on further cross examination that he testified before the grand jury that Jones was hanging out of the sunroof of the white Dodge Charger and Augustin was hanging out of the back driver’s side passenger window. He admitted that his testimony at the instant trial was different than that testimony, insofar as where defendants were seated. He admitted that he lied about that before the grand jury, saying that he had just wanted to move on with the case. Mr. Baker said he had been told that the bullet wound to his foot came from the assault weapon. Noting that Mr. Baker main *1071 tained that Augustin had a handgun, defense counsel showed him . his grand jury testimony reflecting that he testified then that Augustin was shooting and hit him in the foot. He said they must have typed it up wrong.
Rod Clancy, a supervisor with the New Orleans District Division of Probation and Parole, testified that someone his office supervised, one Jonathan Peters,[1] was incarcerated in Hunt Correctional Center in St. Gabriel, Louisiana on 23 February 2010. He said the District Attorney’s Office gave him the name and |nMr. Peters’ date of birth, and he obtained the information from their computer system. He did not check to see if there was more than one Jonathan Peters in the system. He said this Jonathan Peters’ records showed a number of drug offenses.
NOPD Detective Mary Colon testified that she worked in the Fifth Police District, which, she said, covered the Ninth, Eighth, and Seventh Wards of the City of New Orleans. She was the first to respond to the shooting call in the 1400 blopk of Gallier Street on 23 February 2010, arriving at approximately 1:35 p.m. She was the lead detective in the case. She was directed to a porch of 1401 Gallier Street where the victim, Lucious Baker, was located. EMS personnel arrived on the scene shortly thereafter. Mr. Baker was bleeding profusely from his arm, and she was unable to get a good description as to what happened. Detective Colon relocated to 1407 Gallier Street, where the second victim, Mrs. Rogers, was located. Another crime scene was at 1321 Gallier Street, where a bullet was fired into a residence. Detective Colon was familiar with a group that used to call themselves the “ ‘G’ Block,” one of whom used to reside at 1321 Gallier. That group, combined with the “Third and Galvez Boys,” now call themselves the “Three Nine.” Detective Colon testified that the occupant of 1321 Gallier, “Joselin” Darrensbourg, told her that she stepped outside her residence after the shooting stopped and saw a white Charger automobile in the next block over — in the 1400 block of Gallier. Detective Colon also testified that Gladys Rayfield told her that she had seen a white vehicle parked in front from which the shooting emanated, and that she stepped away because they started shooting at her residence.
Detective Colon left the scene after a couple of hours and went to University Hospital, where Mr. Baker was being treated in-the emergency room. Mr. Baker lipwas concerned about Mrs. Rogers, asking the detective about her. He related to the detective that he had been on the corner of Gallier and North Villere Streets when he observed a white Charger in the 1300 block shooting into a residence. He stated that he attempted to go to his residence several houses down and across the street, when the white Charger sped up to where he was and began shooting at him. Mr. Baker said that a rival acquaintance he knew as “Peewee” was in the front driver’s side while someone he knew as “Puggy” was in the rear passenger seat. Mr. Baker stated that both individuals had the number “8” tattooed between their eyebrows. He described “Peewee” as wearing a black t-shirt, and stated that “Peewee” never got out of the car. Mr. Baker described “Puggy” as wearing a black shirt and black baseball cap, and said that “Puggy” exited the car to shoot at him. He also gave physical descriptions of both men, to which Detective Colon testified. Detective Colon stated that Mr. *1072 Baker told her that both men were armed with assault rifles.
Detective Colon testified that, coincidentally, a couple of days before the day of the shooting in the instant case she had conducted a field interview on North Derbig-ny and Mandeville Streets of “Peewee,” who she said was defendant Augustin. She said there had been a shooting at Spain and North Roman Streets, and a complainant had called in that the subjects who had been standing on the corner who had been shot at had relocated to Mande-ville Street. She said Augustin and two others were at that location when she arrived. The detective said that location was in the Eighth Ward, where, she said, “they” frequent. She explained the 1400 block of Gallier Street was in the Ninth Ward, a little over one mile away. Detective Colon said that she was very familiar with the other suspect, “Puggy.”
Detective Colon relocated to NOPD headquarters some seven to eight blocks away, verified the identities of “Peewee” and “Puggy,” and prepared two photo Inlineups. She returned to University Hospital and presented them to Mr. Baker, who identified both defendants. This was on the evening of the shooting, shortly after 5:00 p.m. She said Mr. Baker was in pain from his hand but that he was coherent, responsive, and alert. Detective Colon testified, without objection, that she was aware defendants knew each other because they were both members of the Eighth Ward “Ride or Die” (“ROD”) gang.
Detective Colon replied in the negative when asked on cross examination whether she had ever heard from Mr. Baker that thirteen to fourteen people had been standing outside in the 1300 block of Gallier Street at the time of the shooting. No fingerprints were found on the spent cartridge casings recovered at the crime scene. Detective Colon understood that when she first questioned Mr. Baker in University Hospital he had not been administered any medication. She said that at the time she displayed the photo lineups to Mr. Baker around 5:00 p.m., it would not have made any difference if she had known he had just been administered morphine. Detective Colon admitted that .223 caliber rifle ammunition can be used in a sporting rifle other than an assault rifle. No report came back that would have helped her identify the kind of firearm from which the bullet casings found at the scene were fired. Most of the casings were found in front of 1407 Gallier. She said the physical evidence corroborated that which Mr. Baker told her happened. She admitted that she based her investigation on what Mr. Baker told her.
Detective Colon admitted that throughout the entire investigation no one told her that a handgun was involved. She agreed that if Mr. Baker had testified before the grand jury that “Peewee” had used a handgun to shoot at him, that would contradict what he told her in the hospital. Detective Colon confirmed that she had |12no evidence linking either defendant to a Dodge Charger, although she testified that she had received intelligence information regarding the white Charger but was unable to confirm it. On subsequent redirect examination, Detective Colon testified that she had received information that the mother of Byron Jones, a relative of Jones, owned a white Charger. Detective Colon said Byron Jones, like Jones and Augustin, was a member of the “Ride or Die” gang.
Detective Colon stated on redirect examination that if Mr. Baker was given any medication in the hospital, he was not given much because he was still complaining of pain when she talked to him. She indicated that there was no suggestion that he did not understand what he was doing: he was not slurring his speech; he was not *1073 drowsy; and he did not have problems remembering anything.
Sandy Gavin, an investigator with the Orleans Parish District Attorney’s Office, testified that he ran rap sheets under the name of Jonathan Peters in the State system, and got a Jonathan Peters and a “Johnathan ” Peters. He obtained rap sheets for both people. “Jonathan” Peters had never been arrested in Orleans Parish, only in St. Tammany and Washington Parishes. “Johnathan” Peters was convicted of a drug offense in 2009 and was sentenced to seven years in prison. Mr. Gavin was shown the affidavit executed by Mr. Baker, which spelled Mr. Peters’ first name as “Johnathan,” matching the spelling on the rap sheet of the Mr. Peters who was sentenced to seven years in prison in 2009.
Don Hancock, the telecommunications supervisor for the Orleans Parish Sheriffs Office, Technical Services Division, testified that he was a custodian of records for recordings of jailhouse telephone calls made by inmates. He testified to the procedure whereby all inmate telephone calls made from jail are automatically recorded. He said all inmates are issued a PIN (personal | ^identification number) or folder number, and that PIN or folder number is used for making telephone calls. He testified that when an inmate picks up a handset, he/she is automatically prompted to do several things, including enter a phone number and state his/her name. He testified that all of the recorded inmate phone calls are archived. Mr. Hancock identified State’s Exhibit 24 as one CD containing the complete telephone calls— 196 of them — Jones made from prison between 18 March 2010 and 28 September 2010; State’s Exhibit 25 as a CD containing excerpts from three phone calls contained in State’s Exhibit 24; and State’s Exhibits 26, 27, and 28 as transcripts of the three excerpts on State’s Exhibit 25. State’s Exhibit 25 was played for the jury, consisting of excerpts of calls Jones made on 21 March 2010, 22 March 2010, and 25 March 2010. Mr. Hancock confirmed that he had personally listened to the original three phone calls in State’s Exhibit 24 from which the excerpts on State’s Exhibit 25 were taken, verifying that the excerpts were from those original calls, and that the transcripts accurately, as best he could tell, represented what was said in the phone call excerpts in State’s Exhibit 25.
Mr. Hancock also identified State’s Exhibit 29 as jailhouse phone calls made by Augustin from 8 March 2011 through 14 April 2011, consisting of 315 calls. He identified State’s Exhibit 30 as excerpts of five of those phone calls contained in State’s Exhibit 29, a fact he had personally verified by listening to the entirety of the original calls. He identified State’s Exhibits 31, 32, 33, 34, and 35 as transcripts of those five excerpts contained in State’s Exhibit 30. In introducing the transcripts, the state informed the court that it had identified two different transcripts as State’s Exhibit 32, and relabeled one as State’s Exhibit 36, making it six transcripts of six call excerpts. The state identified State’s Exhibit 31 as a |!4transcript from 9 March 2011; State’s Exhibit 32 as from 10 March 2011; State’s Exhibit 33 as from 11 March 2011; State’s Exhibit 34 from 12 March 2011; State’s Exhibit 35 as from 16 March 2011; and State’s Exhibit 36 as from 17 March 2011.[2]
*1074 Mr. Hancock admitted on cross examination that he could not identify who was talking when listening to the phone calls, only whether the person was a male or a female. He also stated that his purpose in listening to the recordings was to make sure the original calls, the portions excerpted from those original calls, and the transcripts matched closely, not necessarily exactly, He did not transcribe the call excerpts. He did not download the audio recordings of the calls onto the two CDs containing the alleged calls by Jones and Augustin, State’s Exhibits 24 and 29, respectively. He said his co-worker, Jim Huey, did that. He testified that Mr. Huey’s job was to honor requests for jail phone recordings.
Mr. Hancock did not know who “burned” the jailhouse telephone call excerpts from Jones (three excerpts) and Augustin (six excerpts) onto two separate discs, State’s Exhibits 25 and 30, respectively. Mr. Hancock did not know who had transcribed the three excerpts of calls by Jones from State’s Exhibit 25, those transcriptions being State’s Exhibits 26-28. Nor did Mr. Hancock know who had transcribed the six excerpts of calls by Augustin from State’s Exhibit 30, those transcriptions being State’s Exhibits 31-36.
Mr. Hancock admitted that he obtained all the discs and the transcribed excerpts from the District Attorney’s Office.
11sAt the conclusion of the state’s case in chief the court, at the request of the state, the ADA had the defendants stand before the jury to display their respective facial tattoos.
Barksdale Hortenstine, Jr., an attorney with the Orleans Parish Public Defender’s Office, testified that he represented Ernest Blackmond in Orleans Parish Criminal District Court in April 2011. Lucious Baker testified against Mr. Blackmond. Mr. Baker had executed an affidavit in Mr. Hortenstine’s office to the effect that what he had told police about the events in question were not the events that had transpired, and that he wished to set the record straight. However, Mr. Baker contradicted his affidavit when he subsequently testified at Mr. Blackmond’s other trial. Mr. Hortenstine testified that Mr. Black-mond was on trial for murder, and Mr. Baker had told police he was at the scene. When Mr. Hortenstine cross examined Mr. Baker at the trial as to why he had executed the affidavit, Mr. Baker said it had been because Mr. Hortenstine was to pay him $3,000. Mr. Hortenstine denied having done that, and he stated that Mr. Blackmond ultimately was found not guilty at that trial.
Mr. Hortenstine admitted on cross examination that he had no knowledge at all of the facts of the instant case, except to the extent that in preparing for Mr. Black-mond’s trial he had subpoenaed recordings of the jailhouse telephone calls made by Mr. Baker during his stays in jail leading up to the date of Mr. Blackmond’s trial. Mr. Hortenstine testified that during one of these periods Mr. Baker told his grandmother in a telephone call that he had been held on a drug court hold, and that he was not getting released, even though he was set to be released, because the District Attorney was holding him “until he would cooperate with the Grand jury testimony that they instructed him he needed to do.” Mr. 11fiHortenstine testified further on cross examination that in Mr. Blackmond’s trial the two chief points of Mr. Baker’s testimony were contradicted by a police officer’s testimony and by the physical evidence.
George Hesni, Jr. was asked by Augus-tin’s counsel whether he remembered being in court on or about 15 July 2011 in the instant case. Mr. Hesni stated that he *1075 was certain he was in court, but did not actually remember being there. Mr. Hes-ni was asked if he remembered suggesting to Lucious Baker that if he were to testify in connection with the affidavit he would be subjecting himself to perjury. Mr. Hesni testified that he did not remember speaking to Mr. Baker, but that he would not be surprised if he told any witness that if he/she lied that he would have them arrested for perjury. Nor did Mr. Hesni recall speaking with Mr. Baker’s defense counsel, Nandi Campbell, about the case, reiterating that he did not remember the case.
Louis Russo testified that he was employed by the Orleans Parish District Attorney’s Office in January and February of 2010, and that he had continued to be and was then currently so employed. Mr. Russo recalled going to Lucious Baker’s home with a D.A. investigator some time in 2010 to talk to him about the instant case. He had several times attempted to have Mr. Baker come to the office, and he confirmed that his efforts were frustrated by Mr. Baker’s lack of cooperation. When he asked Mr. Baker in Mr. Baker’s home about the case, Mr. Baker told him that he never made an identification of anyone who shot him. When confronted with a copy of a photo lineup bearing Mr. Baker’s signature on the back, Mr. Baker admitted that it was his signature, but said he had only signed the lineup because that was where the police officer told him to sign it. Mr. Russo confirmed that he did not believe Mr. Baker about this and thought he was a liar.
117Mr. Russo testified that he recommended that the case be refused, and that recommendation was accepted. Mr. Russo identified the D.A. screening action form for Jones, reflecting that the charges were refused, and Mr. Russo’s comments/reasons for recommending that the charges be refused — all relating to the actions by Mr. Baker discussed above. Mr. Russo also identified the 17 March 2010 screening action form refusing the charges against Augustin, with essentially the same comments/reasons set forth as to Jones, with an additional comment that the victim had “tanked” the case. Mr. Russo explained this meant that Mr. Baker had ruined the case so he would not have to participate in it. Mr. Russo was shown his handwritten notes about the case in which he had written that Mr. Baker was “clearly lying” when he told him that he never told the police officer he was certain of his identification of Augustin, who was the only one of the two defendants in custody at that particular time, and that the officer had told him where to sign. When asked if he was correct in originally refusing the charge, Mr. Russo replied that he did not think so. He agreed that the primary evidence insofar as who committed the crime was still the victim’s testimony. Mr. Russo confirmed that the policy of the District Attorney’s Office changed, and the case was reopened. He admitted that he had no additional information/evidence than he had in March 2010 when the case was refused.
Mr. Russo agreed that Mr. Baker did not appear when subpoenaed to testify before the grand jury in the instant case. He had the court issue a capias for Mr. Baker’s arrest, whereupon Mr. Baker was taken into custody. On 10 February 2011, Mr. Baker appeared before the grand jury in a yellow prison jumpsuit and chains. Mr. Russo admitted that at some point prior to testifying before the grand jury Mr. Baker asked him if he would be able to go home, and that he, Mr. Russo, 11Rtold him he should be able to go home as soon as he was finished testifying. Mr. Russo told Mr. Baker that he would let the court know when he testified and ask the court to release him. Mr. Russo was read an *1076 excerpt of his questioning of Mr. Baker, and Mr. Baker’s answers, before the grand jury, concerning what Mr. Baker told Mr. Russo when Mr. Russo came to his residence with an investigator. Mr. Russo confirmed that what Mr. Baker said was different from what he had told him during the visit to Mr. Baker’s residence.
Mr. Russo confirmed on cross examination by the state that he and the D.A. investigator went to visit Mr. Baker on 17 March 2010, at the same residence on Gal-lier Street where Mr. Baker was living when the crime occurred. Mr. Russo said they probably went there in an unmarked police vehicle with a spotlight, and that Mr. Baker was not expecting them. Mr. Russo said that in his experience scared and shaken victims are truthful about what happened in a traumatic event when officers respond shortly thereafter, but then when they heal up they get cocky, get scared, and start trying to evade the District Attorney’s Office to avoid the prosecution.
Mr. Russo was questioned on cross examination, redirect examination, and recross examination relative to one of Jones’s jailhouse phone calls, transcribed as State’s Exhibit 27, wherein “J-Roc,” who was conversing with Jones, asked Jones what happened “with the SK.” Mr. Russo — who confirmed that he was also in the military — testified that in his opinion “SK” was short for “SKS” which, he said, was a type of assault rifle used in the shootings in the instant case, based upon the kind of spent cartridge casings recovered at the scenes. Jones asked “J-Roc” if he had gotten the “SK,” and “J-Roc” replied in the negative, but told Jones that he needed to tell someone to give it to him, meaning “J-Roc.” Jones talked to anoth-erJjtjindividual, “Ro-Ro,” during the same call of “that thing” being too big to be walking around with it. Talking to “J-Roc,” Jones noted that it was “hot;” that “they got some Yea’s on there;” and he appeared to caution “J-Roc” against walking around with “it.” Asked by the prosecutor what it meant when a gun is “hot,” Mr. Russo testified that it meant that it was stolen, or that it could mean that it had been recently fired.
Nandi Campbell was in court on 15 July 2011, as Lucious Baker’s attorney, in connection with a Motion to Quash an indictment. Mr. Baker was supposed to testify in a hearing on the matter, and she spoke with both George Hesni, Jr. and defense counsel. Mr. Hesni advised Ms. Campbell that if Mr. Baker’s testimony at the hearing was different from his testimony given before the grand jury he could be subject to a perjury charge. She said Mr. Baker subsequently testified and asserted his Fifth Amendment privilege against self-incrimination.
Vickie Bartels confirmed that she remembered being a witness on an affidavit that was executed in the office of Augus-tin’s counsel by Lucious Baker. She identified Defense’s Exhibit 8 as that affidavit, noting that it was dated 16 March 2011. When asked to describe Mr. Baker’s demeanor in the office at that time, Mrs. Bartels stated that he seemed relaxed, slouching in his chair. Mrs. Bartels did not recall defendant’s mother being in the room when she was there and she did not see any money change hands.

ERRORS PATENT

A review of the record reveals no patent errors.
AUGUSTIN — ASSIGNMENT OF ERROR NO. 1
JONES — ASSIGNMENT OF ERROR NO. 2
J^In Augustin’s Assignment of Error No. 1 and Jones’ Assignment of Error No. 2, the defendants each argue that the *1077 evidence was insufficient to support their convictions.
When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, we must first determine the sufficiency of the evidence before proceeding to review other asserted trial errors. State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55, citing State v. Hearold, 603 So.2d 731, 734 (La.1992).
This court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mus-sall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common |21experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Huckabay at p. 32, 809 So.2d at 1111, quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-07.
In a prosecution for attempted second degree murder the state must prove that the defendant: (1) intended to kill the victim and (2) committed an overt act tending towards the accomplishment of the victim’s death. State v. Johnson, 08-1488, p. 9 (La.App. 4 Cir. 2/10/10), 33 So.3d 328, 334, citing State v. Bishop, 01-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437; La. R.S. 14:27; La. R.S. 14:30.1. Specific intent exists “when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the defendant’s actions. Johnson at p. 10, 33 So.3d at 334.
*1078 When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Weary, 03-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311; State v. Neal, 00-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658.
In the absence of internal contradiction or irreconcilable conflict with the physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Williams, 11-0414, p. 18 (La.App. 4 Cir. 2/29/12), 85 So.3d 759, 771, writ denied, 12-0708 (La.9/21/12), 98 So.3d 326, citing State v. Robinson, 02-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79.
Both defendants’ arguments as to the sufficiency of the evidence concern the credibility of the only witness who identified them, Lucious Baker, in a prosecution where there was no physical evidence linking either defendant to the shootings.
Defendants point to inconsistencies between Mr. Baker’s trial testimony, what he told Detective Mary Colon, what he told ADA Greg Russo when Mr. Russo and a D.A. investigator went to Mr. Baker’s home, and his actions with regard to executing an affidavit in the office of Augus-tin’s counsel, in which he stated that two others were responsible for shooting him.
However, the starting point is the shooting. Detective Colon, the lead detective in the case, was a few blocks away when the call came out and arrived on the scene shortly after the shooting. The EMS unit arrived shortly after she did, and consequently she was only able to speak with the victim, Mr. Baker, very briefly before EMS personnel began attending to him and taking him to University Hospital. Later that same afternoon she went to the hospital, at which time Mr. Baker told her that he knew the shooters as “Puggy” and “Peewee.” Detective Colon testified that she was familiar with “Puggy,” and that several days earlier she had conducted a field interview of “Peewee.” Detective Colon relocated to NOPD headquarters some seven to eight blocks away, verified the identities of “Peewee” and “Puggy,” and prepared two photo lineups. She returned to University Hospital on evening of the shooting shortly after 5:00 p.m. and presented them to Mr. Baker, who identified both defendants. She said Mr. Baker was in pain from his hand but that he was coherent, responsive, and alert. | ^Detective Colon testified, without objection, that she was aware the defendants knew each other because they were both members of the Eighth Ward “Ride or Die” gang.
It is undisputed that Lucious Baker would later tell ADA Louis Russo that the defendants were not the shooters, but he testified at trial that he had done so because he was afraid for his family. Mr. Baker only testified before the grand jury that defendants were the shooters after he was arrested and placed in custody; he testified before the grand jury in prison garb and restraints. Mr. Russo testified that in his experience scared and shaken victims are truthful about what happened in a traumatic event when officers respond shortly thereafter, but then when they heal up they get cocky, scared, and start trying to evade the District Attorney’s Office to avoid the prosecution. Mr. Russo was shown his handwritten notes about the case in which he had written that Mr. Baker was “clearly lying” when he told him that he never told the police officer he was certain of his identification of Augus-tin, who was the only one of the two defendants in custody at that time, and that the officer had told him where to sign the lineup.
*1079 Mr. Baker also executed an affidavit in the office of Augustin’s counsel, asserting that two others were the shooters. Mr. Baker testified it was Augustin’s mother who gave those names to him. Evidence was presented that Mr. Baker had done something similar in another ease, involving a homicide. In the instant case and in the other case Mr. Baker ultimately testified at trial that the individual(s) he originally had identified were the perpetrators. Testimony at trial established that the defendant in the other case had been found not guilty.
As for the affidavit in the instant case, Mr. Baker confirmed upon questioning by Augustin’s defense counsel that defense counsel had showed |¡>4surprise in his office when Mr. Baker indicated two “totally different” people as the shooters. In questioning Mr. Baker, Augustin’s defense counsel stated as a fact that Augustin’s mother, Nicole Augustin, was in counsel’s office when Mr. Baker signed the affidavit.
The state also argues that recorded jailhouse telephone calls by both defendants confirm that Augustin arranged for eyewitness Lucious Baker to sign the affidavit in the office of Augustin’s counsel in which he purported to identify two other individuals as the shooters. In State’s Exhibit 26, Jones referred to having “Charcoal” “come down” and sign an affidavit that “I didn’t do that s* * In a jailhouse call from Augustin, State’s Exhibit 31, a female he was talking to mentioned that a “boy” wanted money. In another call from Au-gustin, State’s Exhibit 88, a female told him that “that’s why they dropped the charges the first time because they couldn’t get in contact with Charcoal.” In that same call Augustin and the female discussed Charcoal wanting money, and that the lawyer was going to deal with that.
The state also cites a jailhouse call from Jones, State’s Exhibit 26, in which — according to an interpretation given by ADA Louis Russo in his trial testimony — Jones referred to an assault rifle of the type used in the shootings in the instant case. The state argues that Jones “directed” an individual to conceal the gun. However, Jones did not actually “direct” an individual to conceal the “SK.” Rather, an individual on the call, “J-Roc,” asked Jones what was happening with the “SK” and told Jones that he had to tell someone to give it to him. However, the call might be interpreted as evidence of a conspiracy to conceal the “SK.”
The trial transcript and record are rife with examples of inconsistencies between Lucious Baker’s various statements to individuals and his trial testimony, | ¡¡¡¡as well as his grand jury testimony. However, he identified both defendants as the shooters within hours after the shootings. Detective Colon testified that the two defendants were in the same gang, and each had the numeral “8” tattooed on their forehead between their eyes. There was no evidence presented suggesting why Mr. Baker would intentionally identify the defendants as the shooters if he did not believe they were, in fact, the shooters.
Detective Colon testified that the occupant of 1321 Gallier Street, “Joselin” Dar-rensbourg, told her that she stepped outside her residence after the shooting stopped and saw a white Charger automobile in the next block over, in the 1400 block of Gallier — contrary to Ms. Darrens-bourg’s negative reply when asked during her cross examination if she had seen a white Dodge Charger that day. Detective Colon also testified that Gladys Rayfield told her that she had seen a white vehicle parked in front that was shooting, and that she stepped away because it started shooting at her residence — contrary to Ms. Ray- *1080 field’s negative reply on direct examination when asked if she had seen any cars driving by. Thus, Detective Colon’s testimony as to what these witnesses told her — as to which there were no defense objections— corroborated Mr. Baker’s testimony insofar as he said defendants were shooting from a white Charger. Finally, Detective Colon testified that she had received information — but could not confirm it — that the mother of a relative of Jones owned a white Charger. That male relative of Jones was also a member of the “Ride or Die” gang, of which Jones and Augustin were members.
Lisa Rayfield testified that when Mr. Baker came into her residence bleeding all over her floor, having been wounded in his hand and his foot, she asked him who shot him, and he said he did not know. However, she also testified that she la-,did not personally know Mr. Baker, and that she only knew him as someone who lived in the neighborhood. Mr. Baker denied that Ms. Rayfield asked who had shot him. It was a hectic scene, and Mr. Baker was bleeding and suffering from two gunshot wounds.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Lucious Baker was credible insofar as his identification of the defendants as the two individuals in the white Dodge Charger automobile who were hanging out of the windows (or one out of the sunroof) and shooting at him.
As for specific intent to kill, Mr. Baker testified that after he was shot in the hand and foot, had hopped the fence, and was crawling down the alley, Jones got out of the car and shot at him with an assault weapon. Mr. Baker testified that he was told he had been shot with an assault weapon.
Pointing and firing a gun at a person is a circumstance from which an inference can be drawn that a defendant possessed specific intent to kill, but the circumstances surrounding that act, such as the distance from the firearm to the victim and the number of shots fired, must also be considered. State v. Cooks, 11-0342, p. 17 (La.App. 4 Cir. 12/14/11), 81 So.3d 932, 942, writ denied, 12-0112 (La.5/18/12), 89 So.3d 1189.
Approximately 29 spent cartridge casings were collected from two shooting scenes as evidence, mostly .223 caliber casings which, the evidence established, can be fired from both an assault weapon as well as sporting rifles. In addition to that caliber of spent cartridge casings, several 9mm casings were recovered, as well as two .40 caliber casings. Mr. Baker testified that Jones fired an assault weapon at him. Although Mr. Baker was shot in the hand and foot, no evidence |27was presented to suggest Jones was aiming at those small targets while shooting from the moving car, intending only to wound, and not kill, Mr. Baker. Numerous shots were fired, almost all being from an assault weapon.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Jones specifically intended to kill Mr. Baker. As for specific intent to kill victim Mrs. Bessie Rogers, Jones does not devote any part of his argument to distinguishing between specific intent to kill Mr. Baker or Mrs. Rogers, even though the evidence shows that the reckless shooting was directed at Mr. Baker, with Mrs. Rogers being an unseen innocent bystander inside of her residence.
This court has commented on the theory of transferred intent, stating that “[w]hen a person shoots at one person with the specific intent to kill or inflict great bodily *1081 harm and accidentally kills or inflicts great bodily harm upon another person, if the killing of [sic] inflicting of great bodily harm would have been unlawful against the first person, then it would be unlawful against the person actually shot, even though that person was not the intended victim.” State v. Jordan, 97-1756, p. 16 (La.App. 4 Cir. 9/16/98), 719 So.2d 556, 567, quoting State v. Jasper, 28,187 (La.App. 2 Cir. 6/26/96), 677 So.2d 553. The trial court in the instant case instructed the jury on the theory of “transferred intent.”
Thus, the evidence being sufficient to sustain the conviction for attempted second degree murder against Jones for the shooting of Mr. Baker, it is likewise sufficient to sustain the conviction for the attempted second degree murder of Mrs. Rogers.
As for Augustin, he argues that the evidence is insufficient as to the issue of specific intent because both of Mr. Baker’s wounds were caused by a .223 caliber 128rifle bullet, and Mr. Baker testified that it was Jones who fired an assault rifle while he, Augustin, fired a handgun.
Mr. Baker testified at trial that “I think” Jones had the assault rifle when he observed him firing out of the vehicle, and that Augustin had a handgun. However, he also stated without qualification that Jones had an assault weapon when he exited the vehicle and fired at him as he crawled down an alleyway after being shot in his hand and foot. Detective Colon recalled that Mr. Baker told her that both defendants were armed with assault rifles.
Regardless, Mr. Baker testified that both defendants were shooting at him, and even a defendant who fires no shots can be found to have the requisite specific intent to kill as a principal. See Cooks, 11-0342, pp. 15-16, 81 So.3d at 941 (to demonstrate that a non-shooter has the specific intent to kill, the state is required to establish that the circumstances indicated that the non-shooter also actively desired the death of the victim).
The parties to crimes are classified as principals and accessories after the fact. La. R.S. 14:23. All persons concerned in the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission, are principals. La. R.S. 14:24.
Even assuming for the sake of argument that both Mr. Baker and Mrs. Rogers were wounded by bullets fired by Jones, considering that Mr. Baker testified that Augustin was shooting a handgun at him, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Augustin possessed the specific intent to kill Mr. Baker and, under the theory of “transferred intent,” Mrs. Rogers also.
|;.c|We find no merit to these respective assignments of error questioning the sufficiency of the evidence.

AUGUSTIN-ASSIGNMENT OF ERROR NO. 2

JONES-ASSIGNMENT OF ERROR NO. 1

In these respective assignments of error, the defendants argue that the trial court erred in admitting evidence of recorded telephone calls placed from jail that were not properly authenticated and which also denied defendants their respective Sixth Amendment rights to confrontation. Evidence of jailhouse phone calls made by both defendants was introduced in evidence. However, Jones’ argument is directed only to the admission of his jailhouse calls. Augustin addresses the admission of both his and Jones’ jailhouse calls.
*1082 However, neither defendant sets forth in his respective appellate brief, whether in his statement of the facts, in the assignments of errors raised as to this issue, et cetera, exactly what was contained in this evidence that prejudiced him. Neither defendant refers in any way in any part of his brief to what either of them might have said in any jailhouse telephone call that was published to the jury. Therefore, they have failed to show how they were prejudiced in any way by the admission of the evidence. Thus, this fact necessarily precludes any finding of reversible error as to either of these assignments of error. See La.C.Cr.P. art. 921 (“A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.”). Nevertheless, we address the assignments in more detail.
On 6 December 2011, the state noticed its intent to introduce the jailhouse telephone calls, and excerpts and transcriptions of such excerpts, made by lanAugustin. On 7 December 2011, the first full day of trial, Augustin filed a motion to suppress such statements by him, setting forth no grounds. The written motion had “denied” handwritten on it. The record does not contain a transcript of a hearing on this motion.
Don Hancock, the telecommunications supervisor for the Orleans Parish Sheriffs Office, Technical Services Division, testified that he was a custodian of records for the recordings of jailhouse telephone conversations. He testified to the procedure whereby all inmate telephone calls made from jail are automatically recorded. During Mr. Hancock’s testimony two CDs were introduced containing, respectively, numerous phone calls made from jail by each defendant during a specified period of time. Mr. Hancock testified that his coworker, Jim Huey, who was also a custodian of records for the calls, had downloaded the calls onto the CDs. Mr. Hancock also identified two CDs containing a total of nine excerpts from the original two CDs. He did not know who had “burned” those two CDs containing the excerpts, but testified that he had verified that the excerpts came from particular calls contained on the original CDs. Finally, Mr. Hancock identified separate transcripts of each of the nine call excerpts. Just as he did not know who had “burned” the CDs containing the call excerpts, Mr. Hancock did not know who had prepared the transcripts of the call excerpts. However, he testified that he had compared the transcriptions of the excerpts to the actual excerpts on the CDs, and that the transcriptions matched closely, but not necessarily exactly.
Jones frames the first issue as authentication, because “no one who actually created the tapes or the transcript appeared at trial to testify.” Augustin argues, as to the admissibility of both his and defendant Jones’ jailhouse calls, that their |s1admission was erroneous because they were not properly authenticated, which denied him his Sixth Amendment right to confrontation.
Mr. Hancock testified to the jailhouse calls in two phases. First, he was presented with State’s Exhibits 24-28, covering alleged calls by Jones. Defendants objected only to the admissibility of the transcriptions of the excerpts of the jailhouse calls by Jones, State’s Exhibits 26-28, and they objected on the grounds both that the recordings constituted the best evidence of their content and that it was unknown who prepared the transcripts. However, the “best evidence,” i.e., the actual audio recordings of the call excerpts, was played for the jury, as discussed below. The other objection was as to the issue of authentication, as expressly stated by counsel for *1083 Jones as: “We normally have the person who allegedly transcribed, this here to authenticate it, Your Honor.”
There was no'objection by either defendant as to State’s Exhibit 24, the original CD of the alleged jailhouse calls by Jones, or State’s Exhibit 25, the CD of the excerpts therefrom.
Insofar as the failure to authenticate the transcripts of the call excerpts themselves, Mr. Hancock confirmed that he had personally listened to the original three phone calls in State’s Exhibit 24 from which the excerpts on State’s Exhibit 25 were taken, verifying that the excerpts were from those original calls, and that the transcripts accurately, as best he could tell, represented what was said in the phone call excerpts in State’s Exhibit 25. Generally, “[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied |32by evidence sufficient to support a finding that the matter in question is what its proponent claims.” La. C.E. art. 901(A).[3]
The trial court very clearly instructed the jury — prior to permitting the state to play for it the three excerpts from Jones’ jailhouse calls on State’s Exhibit 25 — that the transcripts, State’s Exhibits 26-28, were merely a guide for them, and that the real evidence was the audio recordings themselves. The court instructed the jurors that if there was a conflict between what they heard and what they read, they were to rely on what they heard, stressing that the transcripts were merely what a transcriber thought he/she heard. Considering the facts and circumstances, one cannot reasonably say that the trial -court abused its discretion in admitting the three transcripts of the three calls, concluding that they were what their proponent claimed they were. To the extent that the trial court might have erred in admitting the transcripts, the error was harmless because the unobjected-to actual audio recordings were played for the jury, and the trial court had instructed the jury that the audio CD of the phone excerpts was the evidence that controlled.
The record contains no right-to-confrontation objection by either counsel prior to publication to the jury of the audio recording excerpts or transcripts thereof of Jones. Therefore, that issue was not preserved for appellate review as to this evidence. See State v. Marlowe, 10-1116, p. 85 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 965-966, writ denied, 12-0231 (La.5/18/12), 89 So.3d 1191 (it is well-settled that an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence, citing La.C.Cr.P. art. 841 A). Not only does an objection have to be made, but La.C.Cr.P. art. 841 A requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. State v. Ott, 10-1307, p. 13 (La.App. 4 Cir. 1/5/12), 80 So.3d 1280, 1287, writ denied, 12-0291 (La.5/25/12), 90 So.3d 408.
For the foregoing reasons, we find no merit to the respective assignments of either defendant insofar as the admission of evidence of the jailhouse phone calls made by Jones.
After the state presented the jailhouse telephone call evidence as to Jones, it presented similar evidence as to Augustin. This evidence again consisted of the CD containing all jailhouse calls made during a *1084 given period that Mr. Hancock testified had been “burned”/downloaded by his co-custodian of recorded inmate phone calls, Jim Huey, State’s Exhibit 29; a CD of excerpts from some of these calls — six, in the case of Augustin, State’s Exhibit 30; and transcripts of those six call excerpts, State’s Exhibits 31-36. As with the excerpts and transcripts of the calls by Jones, Mr. Hancock did not know who had “burned”/downloaded the excerpts onto State’s Exhibit 30, or who had transcribed the excerpts into State’s Exhibits 31-36. However, similar to the jailhouse call evidence with regard to Jones, Mr. Hancock confirmed that the excerpts of the six calls on the CD labeled State’s Exhibit 30 corresponded to the original calls on the CD labeled State’s Exhibit 29, and that the transcripts of the six excerpts accurately depicted the conversations on State’s Exhibit 29.
Augustin’s counsel objected to the admissibility of Augustin’s jailhouse call evidence, apparently to all of it — State’s Exhibit 29, the original CD containing all | S4of the jailhouse calls for the relevant period made by Augustin; State’s Exhibit 30, the CD containing the six call excerpts; and State’s Exhibits 31-36, the six transcripts of those call excerpts. Augustin’s counsel initially objected on the ground of hearsay, complaining that the material had been prepared by someone who was not present to cross examine. This might have sufficed as raising a right-to-eonfrontation/Confrontation Clause issue. However, when the trial court thereafter directed Augustin’s counsel three times to explicitly state the ground for his objection, he merely stated the ground of hearsay as his objection. Thus, the objection by Augus-tin’s counsel was hearsay. Immediately thereafter defense counsel for Jones asked the court to note his objection as well, stating no ground, but which must be assumed to have been on the ground of hearsay, the ground asserted a moment prior by counsel for Augustin. However, as previously noted, on appeal Jones only complains of the admission of the jailhouse phone calls made by himself.
We note that Augustin did not object to the introduction of the evidence of his jailhouse calls on the ground that the state failed to properly authenticate any of it— which was the ground of an objection Au-gustin’s counsel made as to the introduction of Jones’ jailhouse calls.
Augustin’s arguments as to this entire assignment of error — as to the admission of both his and defendant Jones’ jailhouse phone calls — are that the trial court erred in admitting the evidence of his jailhouse calls because the state failed to properly authenticate the evidence, and that the admission of such evidence denied him his Sixth Amendment right to confrontation. However, Augustin did not object on either of those grounds as to the introduction of his jailhouse calls, Island thus did not preserve those issues for review. He objected only on the ground of hearsay, a ground he does not raise or argue on appeal.
Given that neither defendant has cited any particular part of the jailhouse telephone call excerpts by Augustin as having prejudiced him, we do not find that Augus-tin has shown that the trial court’s ruling admitting such evidence, even if such admission might have been erroneous, constituted reversible error. See La.C.Cr.P. art. 921.
Further, insofar as any right-to-confrontation error, confrontation errors are subject to a harmless error analysis. State v. Marcelin, 12-0645, p. 5 (La.App. 4 Cir. 5/22/13), 116 So.3d 928, 932. However, Augustin did not set forth in brief, at any point, precisely what prejudicial evidence came before the jury via the recorded *1085 jailhouse telephone calls. While the CDs themselves are not contained in the appellate record, all nine of the transcripts of the jailhouse call excerpts played for the jury are in the record, and we have discussed some of them above in addressing the sufficiency of the evidence. Counsel had access to these transcripts in the preparation of their respective appellate briefs.
It is not the role of this court to scour the jailhouse call transcripts looking for what this court might consider prejudicial statements, and then ultimately decide whether any possible confrontation error presented by the possible erroneous admission of such evidence was or was not harmless error.
Augustin has failed to show prejudicial error in the admission of evidence of his jailhouse calls.
No merit exists as to either of these assignments or error.

AUGUSTIN-ASSIGNMENT OF ERROR NO. 3

| c.(;In his third assignment of error, Au-gustin argues that his counsel was ineffective in failing to attempt to “develop or investigate” an alibi witness “or to even issue a subpoena to the witness to appear at trial.” He further represents that “[fjollowing trial the defendant and his attorney learned of an individual who was prepared to testify at trial that Alton Au-gustin could not have been the shooter, because Alton Augustin was present in school on the date and at the time of the alleged shootings.” [Emphasis supplied.]
This court set forth the applicable jurisprudence on ineffective assistance of counsel in State v. Rubens, 10-1114, pp. 58-59 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 66-67, writ denied, 12-0374 (La.5/25/12), 90 So.3d 410, as follows:
“As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted.” State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel’s performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” 1 Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
*1086 This court has previously recognized that if an alleged error falls “within the ambit of trial strategy” it does not “establish ineffective assistance of counsel.” Bordes, 98-0086, p. 8, 738 So.2d at 147, quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986). Moreover, as “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. quoting State v. Brooks, 505 So.2d 714, 724 (La.1987).
The record is insufficient to address this claim of ineffective assistance of counsel. There is no record evidence of any such witness in the record before us. Accordingly, this claim is more properly raised by an application for post-conviction relief whereupon an evidentiary hearing may be conducted.

AUGUSTIN-ASSIGNMENT OF ERROR NO. 4

JONES-ASSIGNMENT OF ERROR NO. 3

In these respective assignments of error, the defendants argue that the sentences imposed on them by the trial court are unconstitutionally excessive. The trial court sentenced both defendants to forty years at hard labor on each of the two counts of attempted second murder, without benefit of parole, probation, or suspension of sentence, and with the sentences to run consecutively, making for a total sentence for each defendant of eighty years at hard labor without benefit of parole, probation, or suspension of sentence.
Augustin’s counsel expressly objected that the sentence constituted cruel and unusual punishment, and Jones’ counsel objected to the sentence also. Clearly, both objections were to the alleged exces-siveness of the sentences. In addition, at some point after sentencing Augustin filed a motion to reconsider sentence, which | S8the trial court denied. However, the record on appeal contains neither a written motion to reconsider nor any indication as to what his ground or grounds were.
The maximum sentence of imprisonment on each conviction for second degree murder is fifty years at hard labor, without benefits. La. R.S. 14:27; La. R.S. 14:30.1.
As to the consecutive running of the sentences, La.C.Cr.P. art. 883 states:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
Although Louisiana law favors concurrent sentences for crimes committed as part of a single transaction, a trial judge retains the discretion to impose consecutive sentences on the basis of other factors, including the offender’s past criminality and violence in the charged crimes. State v. Dempsey, 02-1867, p. 5 (La.App. 4 Cir. 4/2/03), 844 So.2d 1037, 1040, citing State v. Thomas, 98-1144, p. 1 (La.10/9/98), 719 So.2d 49.
La. Const, art. I, § 20 explicitly prohibits excessive sentences. Although a sentence is within the statutory limits, the sentence may still violate a defendant’s constitutional right against excessive punishment. State v. Every, 09-0721, p. 7 (La.App. 4 Cir. 3/24/10), 35 So.3d 410, 417. The penalties provided by the legislature reflect the degree to which the criminal *1087 conduct is an affront to society. State v. Cassimere, 09-1075, p. 5 (La.App. 4 Cir. 3/17/10), 34 So.3d 954, 958. A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of | Mpain and suffering, and is grossly out of proportion to the severity of the crime. State v. Ambeau, 08-1191, p. 9 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 221. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Galindo, 06-1090, pp. 15-16 (La.App. 4 Cir. 10/3/07), 968 So.2d 1102, 1113.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. State v. Wiltz, 08-1441, p. 10 (La.App. 4 Cir. 12/16/09) 28 So.3d 554, 561. If adequate compliance with La.C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious offenders. State v. Bell, 09-0588, p. 4 (La.App. 4 Cir. 10/14/09), 23 So.3d 981, 984.
However, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. State v. Stukes, 08-1217, p. 25 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250, citing State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, 819. Further, La.C.Cr.P. art. 881.4 D expressly states that an “appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.”
In sentencing defendants, the trial court told them that whatever “beef’ they had with victim Lucious Baker should have remained between them and Mr. |,lflBaker. The trial court stated that what concerned it the most was that the defendants’ reckless activity resulted in an innocent seventy-eight-year-old Bessie Rogers getting shot in buttocks, stressing that had that bullet struck her elsewhere, she may have died. The trial court commented on the jailhouse phone recordings and the talk of trying to get Lucious “Charcoal” Baker not to testify. The trial court stated that it was not the least bit surprised that Mr. Baker had to be arrested to be compelled to testify. The trial court commented that what played out in the case was what New Orleanians hear and see on the news every day. The court referred to “[sjenseless killings over senseless stuff;” innocent people being injured; and it stated that at some point that must come to an end. The court noted that Jones was twenty years old; that Augustin was eighteen years old; and that both had thrown away their lives. The court noted that it had to decide whether to run the sentences concurrently or consecutively.
In sentencing both defendants to serve forty years at hard labor on each of their two convictions for attempted second degree murder, the trial court ordered that they be served consecutively. The court expressly stated that it was its intent that each defendant serve eighty years at hard labor, without benefit of parole, probation, or suspension of sentence.
In State v. Watkins, 621 So.2d 157 (La.App. 4th Cir.1993), this court found that consecutive sentences of forty years at hard labor for forcible rape, fifteen years at hard labor for aggravated crime against nature, both sentences without the benefit *1088 of parole, probation, or suspension of sentence, and a sentence of fifteen years at hard labor for attempted aggravated burglary, a total sentence of imprisonment at hard labor for seventy years, were not unconstitutionally excessive. The seventeen-year-old victim was home alone sleeping when the 141 defendant jumped on top of her, punched her in the face and began strangling her. He assaulted her, then stole money and jewelry from her. The defendant was twenty-two years old, with prior arrests for simple battery, receiving stolen things, trespass, and theft.
In State v. Charles, 626 So.2d 404 (La.App. 4th Cir.1993), this court found that consecutive sentences of forty years at hard labor on one conviction for forcible rape — with the first two years to be served without benefit of parole, probation, or suspension of sentence — forty years at hard labor as a second-felony habitual offender on another conviction for forcible rape, and twenty years at hard labor on one conviction for attempted forcible rape, were not unconstitutionally excessive. The defendant, who was the boyfriend of the victim’s mother, had first raped the victim when she was eleven years old. He had prior convictions for simple robbery and unauthorized use of a movable.
In State v. Colvin, 11-1040 (La.3/13/12), 85 So.3d 663, cert. denied, Colvin v. Louisiana, - U.S. -, 133 S.Ct. 274, 184 L.Ed.2d 162 (2012), the Louisiana Supreme Court reversed this court’s decision[4] vacating six. ten-year consecutive sentences imposed on a first offender after he pleaded guilty to six counts of felony theft involving post-Hurricane Katrina contractor fraud amounting to more than $250,000.00. The defendant, a former member of the Alabama House of Representatives, had presented to the trial court considerable evidence attesting to his good character, including letters from members of the Alabama House of Representatives and one from the Lieutenant Governor of Alabama. The defendant addressed the court directly, expressing his remorse and his desire to |42make restitution, and asking for forgiveness. The Louisiana Supreme Court found that the trial court had fully articulated the reasons underlying its determination that the case was one of the most serious violations of the charged offense such that it warranted the maximum sentence.
While the record in the instant case does not reflect prior convictions of either of the defendants, their actions were outrageous and egregious. Although the defendants were convicted of the attempted second degree murders of Mr. Baker and Mrs. Rogers, three other residents of the area testified to bullets being fired into their residences during the incident.
“Joselin” Darrensbourg testified that she was babysitting a two-to-three-year old child at a friend’s residence in the 1300 block of Gallier Street when a bullet came through the residence, causing her and the child to get on the floor. Lisa Rayfield, into whose residence in the 1400 block of Gallier Street Mr. Baker fled after being shot, identified photographs at trial depicting bullet holes in her door and in her living room wall; her daughter was home with her at the time of the shooting. Gladys Rayfield, who lived next door to her daughter, Lisa, testified that on the day of the shooting she was sitting on the side of her bed when a bullet came through her mailbox. She resided with her sixty-one-year-old mentally handicapped nephew, and when the bullet entered she jumped up, pushed him to the floor, and got on top of him.
*1089 Thus, in addition to the two victims of the attempted second degree murders in the instant case, Mrs. Rogers and Mr. Baker, there were at least six other victims of the violence perpetrated in two city blocks by the defendants in the instant ease, including another elderly female, her elderly mentally handicapped nephew, and a 14Schild between the ages of two and three years old. Any of these six victims, as well as Mrs. Rogers or Mr. Baker, could have been killed in the shootings.
In sentencing defendants the trial court stated that the type of senseless violence perpetrated on the streets of New Orleans such as in the instant case had to come to an end at some point. The trial court clearly sentenced defendants to two consecutive forty-year sentences each to ensure that neither of them will ever perpetrate such violence again. Thus, we do not find that the sentences make no measurable contribution to acceptable goals of punishment, are nothing more than the purposeless imposition of pain and suffering, or are grossly out of proportion to the severity of the crime. Nor do we find that, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.
We find no merit to either of these assignments of error.

AUGUSTIN-ASSIGNMENT OF ERROR NO. 5

In his final assignment of error, Augus-tin argues that the cumulative effect of the errors complained of rendered the entire trial unfair. He cites some federal jurisprudence, though none from this circuit, for the proposition that errors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair.
However, it is well-settled in Louisiana jurisprudence that the cumulative effect of alleged errors raised by a defendant on appeal, none of which constitutes reversible error individually, does not deprive the defendant of his right to a fair trial, and thus does not constitute reversible error. See State v. Draughn, 05-1825, p. 70 (La.1/17/07), 950 So.2d 583, 629, citing State v. Copeland, 530 So.2d 526, 544-45 (La.1988); State v. Marlowe, 10-1116, p. 67 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 983, writ denied, 12-0231 (La.5/18/12), 89 So.3d 1191; see also State v. Strickland, 94-0025, pp. 51-52 (La.11/1/96), 683 So.2d 218, 239 (the cumulative effect of harmless errors does not warrant reversal of a conviction or sentence); accord State v. Tart, 93-0772, p. 55 (La.2/9/96), 672 So.2d 116, 154.
No merit exists to this assignment of error.

CONCLUSION

For the foregoing reasons, the convictions and sentences of Deloyd “Puggy” Jones and Alton “Peewee” Augustin are affirmed.
AFFIRMED.

. Mr. Peters is the individual that Mr. Baker had identified in the affidavit that he had executed in the accused's counsel office at the urging of Augustin's mother.

. No evidence in this case, such as the CDs of the jailhouse phone calls, or the transcripts of the pertinent call excerpts, were ever received by the Clerk of Orleans Parish Criminal District Court. However, the record on appeal contains copies of all nine excerpt transcripts — State’s Exhibits 26-28 (Jones) and State’s Exhibits 31-36 (Augustin).

. While defendants cite State v. Hennigan, 404 So.2d 222 (La.1981), for the proposition that a specific seven-part foundation must be laid before allowing a recorded statement into evidence, the court in Hennigan merely set forth those foundation requirements because the defendant in that case had cited and quoted them from a 1975 Third U.S. Circuit Court of Appeals decision. The Louisiana Supreme Court did not adopt these requirements.

. State v. Colvin, 10-1092 (La.App. 4 Cir. 4/20/11), 65 So.3d 669.