MURRAY, Judge.
 

 | ,This is a criminal case. The defendant, Antoine Johnson, appeals his conviction and sentence on two counts of attempted second degree murder. For the reasons that follow, we affirm.
 

 STATEMENT OF THE CASE
 

 On February 2, 2004, the State charged Mr. Johnson with two counts of attempted second degree murder, violations of La. R.S. 14:3o.!.
 
 [1]
 
 On February 11, 2004, Mr. Johnson pled not guilty at his arraignment. On May 7, 2004, the trial court found no probable cause to substantiate the charges against Mr. Johnson and granted his motions to suppress the evidence and identification.
 
 [2]
 
 On June 23, 2004, the trial court vacated its earlier rulings, heard testimony on Mr. Johnson’s motions to suppress the evidence and identification, found probable cause, and denied the motions. On November 27, 2007, a jury trial commenced. On November 28, 2007, the jury found Mr. Johnson guilty as charged on both counts.
 

 | gin December 2007, Mr. Johnson filed both a motion for mistrial and a motion for new trial based on juror misconduct.
 
 [3]
 
 Also in December 2007, he filed a motion for post judgment acquittal. On December 20, 2007, the trial court denied all three motions. On the next day, the trial court sentenced Mr. Johnson to serve twenty years at hard labor on each count, sentences to run concurrently, with credit for time served. As a condition of sentencing, the trial court ordered Mr. Johnson to obtain a GED and recommended work release for the last six months of his prison term. On January 18, 2008, Mr. Johnson filed a motion to reconsider sentence. On September 11, 2008, the trial court denied Mr. Johnson’s motion to reconsider, but granted his motion for appeal.
 

 STATEMENT OF THE FACT S
 

 On the evening of July 26, 2003, Sam Davis and Michael Martin were shot by three assailants at the TCL Carwash located on Louisiana Avenue. Surveillance cameras at the carwash captured the incident.
 

 Mr. Davis arrived at the carwash between 6:00 p.m. and 7:00 p.m. to wash his white Monte Carlo. Mr. Davis’ friend,
 
 *331
 
 Michael Martin, arrived at the carwash about one hour later. Shortly thereafter, Mr. Davis and Mr. Martin were ambushed by gunfire. Mr. Davis was shot in his right shoulder and fell to the ground. Mr. Davis remained on the ground until the shooting stopped. Mr. Davis and Mr. Martin then both ran from the area to a nearby post office. Mr. Davis noticed that Mr. Martin had been shot in his leg. Both victims were transported to the hospital. Later, a police officer met with Mr. Davis at the hospital and showed him the surveillance video and a photo lineup. Mr. Davis told the officer that he did not | 3know his assailants and that he did not know of any reason why anyone would shoot him. After viewing the video and photographs, Mr. Dam picked out a person from the photo lineup. Thereafter, Mr. Davis viewed his car and observed that it was “shop up real bad.”
 

 Ms. Natasha Hutchinson lived across the street from the carwash. On the evening of the shooting, she and a friend were in her backyard working on a shed. When she heard gunshots, she dropped to the ground until the shooting stopped. She ran into her house and looked out the front window in the direction of the carwash. In her living room, she noticed that a window was broken and a bullet was on the floor. Ms. Hutchinson called the police and went outside with neighbors. Ms. Hutchinson did not see any of the shooters. However, she observed the following: several of the cars parked on the street had broken windows and bullet holes in them; blood was on her driveway as well as on the sidewalk leading to the post office; and her next door neighbor’s house was sprayed with gunfire.
 

 Mark Georgieff, the carwash owner, met with the police at about 9:00 p.m. on the night of the shooting. He supplied the police with a copy of three recordings of the shooting made by the carwash surveillance cameras and nineteen still images made from the video. He explained that although several surveillance cameras were working on the premises (the car-wash has sixteen surveillance cameras on the exterior area), not all of the cameras captured the shooting. He identified in court the video depictions and still images that he made for the police. Mr. Georgieff testified that the video and some of the still images depict three men running from the back of the carwash to the front shooting guns. One of the |4shooters was using an AK-47 rifle. Mr. Georgieff was unable to identify any of the shooters.
 

 Officer Alex Brady of the New Orleans Police Department (“NOPD”) was dispatched to the carwash to handle the initial investigation. He observed numerous spent bullet casings and two blood trails. He also observed a white Monte Carlo parked on the sidewalk in front of the carwash with several bullet holes and both the side and rear windows shot out. Officer Brady investigated bullet holes in two houses across the street from the carwash. He learned from a detective at the scene that the victims, Mr. Davis and Mr. Martin, had already been transported to the hospital. His investigation concluded with the writing of a report documenting the incident, recording his findings at the scene, and noting that crime lab technicians photographed the shooting scene. Officer Brady neither received a description of the shooters nor spoke to any witnesses.
 

 NOPD Sergeant Lawrence Dupree assisted Sergeant Hochman and Mr. Geor-gieff in obtaining video surveillance of the carwash from Mr. Georgieffs residence. Detective Dupree was present when the downloads of the surveillance video and still photos of the shooting at the carwash were made. He explained that not all of
 
 *332
 
 the surveillance cameras captured the shooting incident and that only copies from the cameras which did record the incident were obtained by the police. Detective Dupree turned the evidence over to Sergeant Jeffrey Hochman.
 

 Sergeant Hochman was assigned to the FBI joint task force investigation of the carwash shooting. He arrived on the scene about thirty minutes after the shooting. He observed a gold Maxima and white Monte Carlo, each with several bullet holes, parked at the carwash. He also observed bullet casings scattered about the area and blood trails on the sidewalk. A neighbor in the area directed | shim to the carwash owner to obtain copies of the surveillance video. Sergeant Hochman viewed the video that night. According to Sergeant Hochman, the video depicted three subjects walking through the car-wash firing long-barreled assault weapons. Sergeant Hochman learned from Officer Philibert, who had been canvassing the area for evidence, that an assault rifle had been located on the back street adjacent to the carwash. When Sergeant Hochman met with the victims in the hospital, neither victim was able to identify any of the shooters.
 

 The NOPD distributed the surveillance video to local news media for public viewing. As a result of the public viewing, the police received multiple crime stoppers tips and was able to trace the recovered firearm to Paul Pierce, who was the cousin of Kendell Washington and Elton Hook. Mr. Pierce identified Mr. Washington and Mr. Hooks from still photos made from the video; however, he was unable to identify the third suspect. Mr. Pierce sold the weapon the police recovered at the scene to his cousin, Raynell Cole. Sergeant Hochman also spoke with Ms. Wilhemina Cole, who was the grandmother of Mr. Hooks and Mr. Washington. Ms. Cole also identified Mr. Hooks and Mr. Washington.
 

 At the United States Attorney’s Office, Sergeant Hochman met with James Al-dridge, who was in federal custody for drug and weapon charges. Mr. Aldridge identified the three suspects depicted in the carwash surveillance video. Through further investigation, Sergeant Hochman identified Mr. Washington as the subject wearing a white striped shirt and hat in the video; Mr. Hooks as the individual in the foreground wearing a long-sleeved T-shirt; and Mr. Johnson as the individual in the background running with Mr. Hooks and Mr. Washington. As a result of the identifications, the NOPD arrested Mr. Hooks, Mr. Washington (who was already in police custody on another charge), and Mr. Johnson. Mr. Hooks admitted his | (¡complicity in the shooting to police at the time of his arrest. He also named Mr. Washington as a participant.
 

 Lieutenant Christy Williams received still photos and copies of surveillance videos from Sergeant Hochman. She logged these items into evidence and placed them into Central Evidence and Property.
 

 The parties stipulated that if called to testify Officer Warren Spears would verify that the NOPD evidence room flooded during Hurricane Katrina.
 

 Tarez Smith, a NOPD crime scene technician, received instructions from Sergeant Hochman concerning collection of evidence at the shooting scene. She recounted at trial that she retrieved a spent bullet that was collected from the floor of the front room of the house located across the street from the shooting scene. She also identified twenty-eight spent bullet casings collected from the shooting scene plus an indeterminate number of “Wolf’ shell casings, additional shell casings, a lead fragment, blood samples, a Norelco SKS rifle, and nine other spent casings.
 

 
 *333
 
 Officer Kenneth Leary, a firearms specialist, compiled a report on the weapon and spent casings retrieved from the crime scene. He examined a Norinco 7.62 by 39 millimeter semi-automatic assault rifle, SKS model, serial No. V 1214 retrieved from the scene. He also examined a Remington 12-gauge pump shotgun retrieved from under the house at 2121 Franklin Court. He also examined several rifle casings recovered from the shooting scene. Officer Leary’s testing indicated that eleven of the bullet casings were fired from the Norinco rifle. The bullet casings were then scanned into the Integrated Ballistic Identification System and returned to Central Evidence and Property.
 

 |7The trial court, out of the presence of the jury, examined Mr. Aldridge regarding his invocation of his Fifth Amendment right not to testify at trial. The trial court declared Mr. Aldridge unavailable for trial, and a law clerk read the transcript of Mr. Aldridge’s testimony at a pre-trial hearing motion into the record. At the pre-trial hearing, Mr. Aldridge testified that he was currently in federal custody after entering into a plea agreement in federal court for drug and weapon (carrying a gun while drug trafficking) charges. Although he pled guilty before meeting with any government agent about the carwash shooting, he acknowledged that he was testifying in the hope that his cooperation would lessen his sentence on the federal charges.
 

 Mr. Aldridge, who was twenty-one years old at the time of the pre-trial hearing, began selling drugs at the age of fifteen. On May 20, 2003, he was arrested on the federal drug and weapon charges. He testified that he knew Mr. Washington, Mr. Hoods, and Mr. Johnson and that he saw them daily up until his arrest. Mr. Al-dridge stated that he was a long time friend of Mr. Johnson and that he kept in touch with Mr. Johnson through phone calls from prison. According to Mr. Al-dridge, in 2003 a gang, called the Third and Galvez Boys, killed his godbrother, LaDevin Pierce. After Mr. Pierce’s death, Mr. Aldridge spoke with Mr. Johnson who informed him that he (Mr. Johnson) was going to kill the individual responsible for killing Mr. Pierce. After the conversation and while in jail, Mr. Aldridge saw the surveillance video on the news of the car-wash shooting. At the pre-trial hearing, the video was played for Mr. Aldridge in court. He identified Mr. Hooks as the individual depicted on the video wearing a black shirt, gray undershirt and blue jeans; Mr. Washington as the individual wearing a blue and white baseball cap, striped shirt, and black shorts; and Mr. Johnson as the | ^individual wearing a black T-shirt, blue shorts, and white tennis shoes. Mr. Aldridge identified Mr. Johnson both by his image and by the clothing he wore, noting that he (Mr. Aldridge) purchased for Mr. Johnson the blue shorts Mr. Johnson was seen wearing in the video. Mr. Aldridge testified that after the carwash shooting he had further conversations with Mr. Johnson in which he (Mr. Johnson) admitted to his participation in the carwash shooting. Mr. Aldridge further testified that Mr. Johnson admitted to him that he, Mr. Washington, and Mr. Hooks fired upon the wrong people.
 

 Dr. Ellen Slaven, an emergency physician at Charity Hospital, testified that she treated the two victims on the night of the shooting. Dr. Slaven described Mr. Martin’s injuries as multiple gunshot wounds to his right forearm, thigh, scrotum, and flank; and she described Mr. Davis’ injuries as a through and through gunshot wound to his right shoulder with lacerations on his chin and over his left eye.
 

 The defense’s sole witness was Powell Miller of the New Orleans Public Defenders Office. Mr. Miller testified that earlier
 
 *334
 
 in this case he represented Mr. Johnson in his capacity as a public defender. In his capacity as Mr. Johnson’s attorney, Mr. Miller interviewed Mr. Aldridge after the pre-trial hearing. Mr. Aldridge indicated to Mr. Miller that he testified against Mr. Johnson at the pre-trial hearing because he believed that Mr. Johnson was safer in prison than on the streets. Mr. Miller acknowledged that he never questioned Mr. Aldridge about whether his motion hearing testimony was untruthful.
 

 ERRORS PATENT
 

 A review for errors patent on the face of the record reveals none.
 

 ASSIGNMENT OF ERROR ONE
 

 |3In his first assignment of error, Mr. Johnson claims the evidence is insufficient to support his conviction on two counts of attempted second-degree murder. He argues that the state failed to negate any reasonable probability of mis-identification because there were no eyewitnesses to the shooting; the two victims were unable to identify their assailants; and the poor quality of the surveillance video made it impossible to identify him as the third shooter.
 

 The standard of appellate review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Either direct or circumstantial evidence may be used to prove the essential elements of the crime. Ultimately, to support a conviction, the evidence, whether direct or circumstantial or both, must be sufficient under Jackson to satisfy any rational trier of fact that the defendant is guilty beyond a reasonable doubt.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983). As to circumstantial evidence, the rule is that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. Credibility determinations are within the discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence.
 
 State v. Vessell,
 
 450 So.2d 938, 943 (La.1984).
 

 To sustain an attempted second degree murder conviction, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim’s death.
 
 State v. Bishop,
 
 01-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437; La. R.S. 14:27; La. R.S. 14:30.1. Although the statute for the completed crime of second degree murder allows for a [ mconviction based on “specific intent to kill or to inflict great bodily harm,” La. R.S. 14:30.1, attempted second degree murder requires proof of a specific intent to kill.
 
 State v. Huizar,
 
 414 So.2d 741 (La.1982). Specific intent “exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the defendant’s actions.
 
 State v. Smith,
 
 94-2588 (La.App. 4 Cir. 3/27/96), 672 So.2d 1034. Charging the victim in a threatening manner and trying to get at him with a knife over a bar has been found to be evidence of specific intent to kill.
 
 State v. Garner,
 
 241 La. 275, 128 So.2d 655 (1961). Likewise, the pointing of a gun at the victim as it was fired has been found to be evidence of specific intent to kill.
 
 State v. Procell,
 
 365 So.2d 484 (La.1978).
 

 In this case, the evidence revealed that after Mr. Johnson learned of Mr. Pierce’s murder, he told his long time friend Mr. Aldridge that he was going to kill the
 
 *335
 
 person responsible for Mr. Pierce’s death. Sometime thereafter, surveillance cameras at the carwash recorded three shooters— later identified as Mr. Washington, Mr. Hooks and Mr. Johnson — firing long barreled weapons at, and seriously wounding, two victims. In a telephone conversation with Mr. Aldridge after the carwash shooting, Mr. Johnson admitted his participation in the shooting, but stated that he had targeted the wrong people.
 

 Mr. Johnson argues that Mr. Aldridge’s testimony was unreliable and self serving because Mr. Aldridge testified in exchange for a promise of leniency in his sentencing on a federal drug and weapons conviction. Consequently, he contends that the state failed to prove his identity as one of the shooters.
 

 InThe jury was read Mr. Aldridge’s pretrial hearing testimony.
 
 [4]
 
 Mr. Aldridge recounted that he and Mr. Johnson knew one another from the neighborhood and that they saw or spoke to each other on a daily basis. Mr. Aldridge recognized Mr. Johnson as one of the shooters from Mr. Johnson’s physical features. He also said that he recognized Mr. Johnson on the video as the shooter wearing a black T-shirt, blue shorts, and white tennis shoes. Mr. Al-dridge pointed out that the blue shorts Mr. Johnson was wearing had a fade spot on the front leg. The blue shorts aided in Mr. Aldridge’s identification of Mr. Johnson because Mr. Aldridge purchased them for Mr. Johnson. Mr. Aldridge admitted that he had entered a plea deal in the federal prosecution, but denied being promised anything with regard to the length of his sentence.
 

 The jury also heard Mr. Miller’s testimony regarding his interview with Mr. Aldridge after the pre-trial hearing. Mr. Miller testified that Mr. Aldridge indicated to him that the reason he testified against Mr. Johnson at the pre-trial hearing was because he believed Mr. Johnson was safer in prison than on the streets.
 

 Based on the evidence presented at trial, it was not unreasonable for the jury to decide that the state proved that Mr. Johnson was guilty of attempted second-degree murder. The jury heard the testimony of Mr. Aldridge, who unequivocally identified Mr. Johnson as one of the shooters depicted in the video. Mr. Aldridge’s identification came from several years of association with Mr. Johnson, seeing him in their mutual neighborhood frequently, and speaking with him on a daily basis. Moreover, Mr. Aldridge testified that Mr. Johnson admitted to him in a telephone | ^conversation that he (Mr. Johnson) participated in the carwash shooting. This assignment is without merit.
 

 ASSIGNMENT OF ERROR TWO
 

 In a second assignment, Mr. Johnson argues that the trial court erred by declaring James Aldridge an unavailable witness and allowing his testimony from the pretrial hearing to be read at the trial. Mr. Johnson maintains that Mr. Aldridge was not unavailable simply because he invoked his Fifth Amendment privilege. Moreover, Mr. Johnson contends the trial court’s ruling violated his Sixth Amendment rights to confront and cross-examine his accuser.
 

 Determining the unavailability of a witness is a preliminary question for the trial court. La. C.E. art. 104(A). Such determinations are subject to manifest error review and will not be overturned absent an abuse of discretion by the trial court.
 
 *336
 

 State v. Ball,
 
 00-2277 (La.1/25/02), 824 So.2d 1089.
 

 The Louisiana Supreme Court has held that when a witness exercises his Fifth Amendment right against self-incrimination, a trial court may properly rule that witness “unavailable” as per La. C.E. art. 804(A)(1);
 
 State v. Bright,
 
 98-0398 (La.4/11/00), 776 So.2d 1134. La. C.E. art. 804(A)(1) provides:
 

 A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is “unavailable as a witness” when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
 

 (1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement ...
 

 Before testimony given at a prior proceeding may be introduced at trial, certain conditions must be met to avoid offending the confrontation and cross-examination clauses of the federal and state constitutions.
 
 State v. Robinson,
 
 423 So.2d 1053 (La.1982). The Louisiana Supreme Court has enumerated those conditions as follows: (1) defendant must have been represented by counsel at the earlier hearing; (2) the witness testified under oath; (3) the witness was cross-examined or else there was a valid waiver of the right to cross-examination; (4) at the time of the trial, the witness (whether out of state or not) is unavailable to testify; and (5) the state had made a good faith diligent effort to obtain the presence of the witness, including by its out-of-state subpoena powers where appropriate.
 
 Robinson,
 
 423 So.2d at 1058.
 

 Mr. Johnson was represented by counsel at the hearing motions. Mr. Al-dridge testified under oath at the hearing on motions and was subjected to lengthy and rigorous cross-examination by three defense attorneys. The State made a diligent effort to ensure Mr. Aldridge’s presence at trial. At trial, Mr. Aldridge was sworn in and advised the trial court that he was exercising his Fifth Amendment rights pursuant to advice of counsel. The trial court thus correctly determined that Mr. Aldridge was unavailable to testify at trial.
 

 In addressing the issue of invoking the Fifth Amendment privilege against self-incrimination, the United States Supreme Court has stated that to sustain the privilege, “it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer ... or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.”
 
 Hoffman v. United States,
 
 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).
 

 At the motion hearings in this case, defense attorney Robert Jenkins objected to Mr. Aldridge’s testimony on the basis that Mr. Aldridge would be incriminating himself. Mr. Jenkins noted that in addition to being prosecuted in federal court Mr. Al-dridge could also be prosecuted in state court for his drug offenses, and that his | Msentences would run consecutively. Mr. Aldridge testified that he was in federal custody after pleading guilty to federal drug and gun charges. Although he had not yet been sentenced on those charges, Mr. Aldridge stated that he hoped he would receive some consideration for his cooperation in this case. He said that before his incarceration, he had been in daily contact with gang members and that he dealt drugs for a living. Mr. Aldridge testified that he was aware before the carwash shooting that Mr. Johnson was intent on killing the men he (Mr. Johnson)
 
 *337
 
 felt were responsible for the death of Mr. Pierce. Mr. Aldridge also stated that Mr. Johnson admitted to him that he (Mr. Johnson) was involved in the shooting in this case.
 

 Under cross examination the defense attorney, Mr. Jenkins, informed Mr. Al-dridge that he faced a possible future murder charge. In fact, Mr. Jenkins specifically stated that “he was getting into some areas that can cause [Mr. Aldridge] to be prosecuted.” Under cross examination from another defense attorney, Mr. Aldridge testified that he was in fact facing up to forty years in prison on one charge, and up to life in prison on another charge, to run consecutively. Based upon the cross examination from the motion hearing, Mr. Aldridge was allowed to confer with his counsel, Rick Tessier, before being called as a witness at trial. Based on that conversation, Mr. Tessier informed the court that Mr. Aldridge’s testimony would “open [Mr. Aldridge] up to various either federal or state offenses.” Mr. Tes-sier also said that as an officer of the court, “it is definitely in [Mr. Aldridge’s] best interest to invoke [his] Fifth Amendment right.” After being sworn by the court, Mr. Aldridge affirmed his attorney’s assertions.
 

 Given these circumstances showing that Mr. Aldridge’s testimony might produce injurious disclosure, we find no error in the trial court’s decision to allow Mr. Al-dridge to invoke his Fifth Amendment privilege against self-in crimination. _[_^Nor was Mr. Johnson’s right to cross examination denied under Louisiana law. Mr. Al-dridge’s motion hearing testimony was given under oath, he was subjected to cross examination from three defense attorneys, and the state ensured Mr. Aldridge’s presence at trial with the intent of calling him as a witness.
 
 Robinson, supra; State v. Hills,
 
 379 So.2d 740 (La.1980). This assignment is without merit.
 

 ASSIGNMENT OF ERROR 3
 

 In his third assignment of error, Mr. Johnson contends his rights to a fair trial and to confront his accusers were violated by the misconduct of jurors in experimenting with the physical evidence. Mr. Johnson maintains that a juror used frame by frame enhancement computer software on his laptop computer when the jury viewed the surveillance videotape footage of the shooting during deliberations. He argues that he was prejudiced by this enhancement because the surveillance tape was not presented at trial with enhancement. Thus, he contends that the jury is guilty of misconduct because it considered evidence not developed at trial and that the trial court erred by denying his motion for new trial.
 

 At the hearing on the motion for new trial, the defense called Deputy Patricia Bruno, who testified that she was posted to Section “K” at the time of this trial and that she was assigned to attend the jury during deliberations. As the jury deliberated, it requested to view again the surveillance video of the shooting incident. Because of the possibility of prejudicial information in the state’s computer, the jury was offered a computer belonging to one of the deputies; however, that computer malfunctioned. The jury viewed the video on a juror’s laptop computer. After deliberating, one of jurors told Deputy Bruno that they viewed the video frame by frame and could clearly see Mr. Johnson’s face. Another juror told Deputy Bruno that the state did not do a good job on the case. | ifiThe juror indicated that during the trial, the state should have shown still shots of the video frame by frame as they had seen it during deliberations. Under cross-examination, Deputy Bruno stated that she did not see the video during delib
 
 *338
 
 erations and that she did not know whether the juror’s laptop contained frame by frame enhancing software or whether the images shown were altered in any manner. Deputy Bruno also stated that Deputy Marshall informed the judge, the district attorneys, and defense counsel that the jury was going to view the surveillance video on a juror’s laptop computer.
 

 Deputy Sheriff Donald Marshall also testified at the hearing. He explained that the jury was offered the computer belonging to Deputy John Albe to view the video, but that computer was inoperable. One of the jurors then offered the use of his personal laptop to view the video. Deputy Marshall did not view the video with the jury.
 

 Assistant District Attorney Rachel Luck Afriek testified that she spoke to the Section “K” deputies after the trial in this matter. Deputy Bruno advised Ms. Afriek that after viewing the surveillance video during deliberations, the jury found Mr. Johnson guilty. Ms. Afriek stated that Deputy Bruno told her that before viewing the surveillance video during deliberations, the jury took a balloted vote and that the vote was seven to five in favor of acquittal. Ms. Afriek also said that Deputy Bruno told her that the jury said that viewing the video during deliberations changed the jury’s verdict.
 

 A photograph is a reproduction of a physical object or scene. It is not “written” evidence of “testimony” within the meaning of La.C.Cr.P. art. 793, which prohibits the use of written material during deliberations. A videotape, like a photograph, is neither testimony nor written evidence and is not excluded by |17La.C.Cr.P. art. 793. Thus, a trial court’s granting a jury’s request to see a videotape after it retired to deliberate is not an abuse of the court’s statutory discretion.
 
 See State v. Davis,
 
 92-1623 (La.5/23/94), 637 So.2d 1012, 1025.
 

 The decision on a motion for new trial rests within the sound discretion of the trial judge, and its ruling will not be disturbed on appeal absent a clear showing of abuse.
 
 State v. Quimby,
 
 419 So.2d 951 (La.1982). The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. As a general rule, a motion for new trial will be denied unless injustice has been done. La.C.Cr.P. art. 851;
 
 State v. Dickerson,
 
 579 So.2d 472 (La.App. 3 Cir. 4/17/91).
 

 In support of his juror misconduct argument, Mr. Johnson cites
 
 State v. Graham,
 
 422 So.2d 123 (La.1982). In
 
 Graham,
 
 the jurors in a murder case conducted an experiment on the time it takes for blood to clot. The defense filed a motion for new trial on the ground of juror misconduct. The trial court denied the motion, and the defendant appealed the denial. The Louisiana Supreme Court considered the issue of a juror considering evidence not developed at trial and noted:
 

 [A] juror who considers evidence not developed or admitted at trial violates his sworn duty and may be guilty of misconduct. Under our statutory law, however, no juror is competent to testify to his own or his fellows’ misconduct or to give evidence to explain, qualify, or impeach any indictment or any verdict found by the body of which he is or was a member. R.S. 15:470. Nevertheless, it is now clear that the statute must yield and that our courts are required to take evidence upon well pleaded allegations of prejudicial juror misconduct violating an accused’s constitutional right to due process, to confront and cross-examine witnesses or to a trial by a fair and impartial jury and to set aside the verdict and order a new trial upon a
 
 *339
 
 showing that a constitutional violation occurred and that a reasonable possibility or prejudice exists.
 

 Graham,
 
 422 So.2d at 131. The
 
 Graham
 
 court also observed:
 

 |1SA juror is expected to draw upon his general knowledge and experience in deciding the case, and he is encouraged to participate in full and robust debate and deliberations with his fellows in reaching a verdict. However, he should not consider facts relating to the case unless introduced at trial under constitutional and legal safeguards.
 
 State v. Sinegal,
 
 393 So.2d 684 (1981). Accordingly, when a juror passes beyond the record evidence in reaching a decision, whether a new trial will be granted depends upon the magnitude of the juror’s deviation from his proper role, the degree to which the accused was deprived of the benefits of the constitutional and statutory safeguards, and the likelihood that the impropriety influenced the jury’s verdict. All of these elements must be weighed in determining whether there is a reasonable possibility that the defendant’s right to a fair trial has been prejudiced.
 

 Id.
 
 at 132.
 

 Although the
 
 Graham
 
 court concluded that the juror’s experiment on blood coagulation was improper conduct, the court said the experiment dealt with a subject within the experience and practical knowledge of all jurors; it “did not involve jurors conducting tests of matters beyond their normal ken or going outside the jury room to obtain esoteric knowledge or special information pertaining directly to the case.”
 
 Id.
 
 The Louisiana Supreme Court concluded that the experiment did not “deprive the defendant of the benefits of constitutional and legal safeguards to the same extent as other tests described in reported decisions,” so “the loss of an opportunity to confront and cross-examine those who conducted the experiment was not as potentially prejudicial to the defendant.”
 
 Id.
 
 at 133-134.
 

 Although Mr. Johnson characterizes the computer software utilized during jury deliberations as frame by frame enhancement software and thus experimentation that allowed the jury to consider evidence not adduced at trial, there is no evidence to support his contention. Deputy Bruno testified that she did not see the video during deliberations and did not know whether the juror’s laptop contained frame by frame enhancing software or whether the images shown were ¡^altered in any manner. Likewise, Deputy Marshall testified that he did not see the video during deliberations and did not know whether the laptop computer contained enhancement software. Thus, there is no evidence that the jury viewed the videotape of the shooting with anything other than standard digital video playing software. The jury’s conduct was nothing more than pausing a video properly admitted into evidence and properly provided to the jury during their deliberations. Despite that the trial judge, prosecutors, and defense counsel were aware that the jury was going to view the videotape on a juror’s laptop computer, no objection was lodged. Even assuming some irregularity on the jury’s part, the information supplied by the videotape was merely cumulative to other evidence of Mr. Johnson’s guilt introduced at trial. This assignment is without merit.
 

 ASSIGNMENT OF ERROR 4
 

 Mr. Johnson’s final assignment of error is that he was denied full appellate review because the transcript of the voir dire proceedings is incomplete in that it does not contain the bench conferences. Because of this omission, he contends there is no way to discern whether the trial court correctly ruled on the challenges.
 

 
 *340
 
 The record in this matter has been supplemented with the transcript of the voir dire proceedings. Since the inclusion of that transcript, Mr. Johnson has filed a supplemental brief; however, he failed to raise any claims based on alleged errors or violations during jury selection in that brief. This assignment is moot.
 

 DECREE
 

 For the foregoing reasons, the defendant’s convictions and sentences are affirmed.
 

 AFFIRMED.
 

 [1]
 

 .Based on the same shooting incident, the State also charged Elton Hooks and Kendell Washington with two counts of attempted second-degree murder. On August 7, 2006, Mr. Hooks pled guilty as charged on both counts and was sentenced to two concurrent terms of ten years. This appeal involves only Mr. Johnson.
 

 [2]
 

 . The State filed a writ application, which this Court granted. (No. 2004-K-0873).
 

 [3]
 

 . The defense filed a post-verdict motion for mistrial citing juror misconduct; however, the trial court allowed defense counsel to amend the motion to a motion for new trial and heard testimony.
 

 [4]
 

 . As noted elsewhere, Mr. Aldridge refused to testify at the trial in this matter; he invoked his Fifth Amendment privilege. Mr. Al-dridge's pre-trial hearing testimony was read to the jury by a law clerk during the state's case.