MADELEINE M. LANDRIEU, Judge.
1 TLatrell Coleman appeals his conviction of attempted second degree murder. After review of the record, we have ascertained two errors patent. For the reasons that follow, we affirm the conviction and sentence of Mr. Coleman. We remand for the limited purpose of correcting the minute entry.
STATEMENT OF THE CASE
Latrell Coleman was charged by bill of information with one count of attempted second degree murder, a violation of Louisiana Revised Statute 14:(27)30.1. Following a jury trial, Mr. Coleman was found guilty as charged. The trial court sentenced him to forty years at hard labor, to be served without benefit of parole, probation, or suspension of sentence. The State then filed a multiple offender bill of information pursuant to Louisiana Revised Statute 15:529.1, charging him as a second felony offender. Mr. Coleman waived a multiple bill hearing and pled guilty to being a second felony offender. The trial court vacated his original sentence and resentenced him to fifty-five years at hard labor, to be served without benefit of parole, probation, or suspension of sentence.
Mr. Coleman filed this appeal raising five assignments of error that the evidence was insufficient to support his conviction; that the trial court erred in ^denying his motion for a mistrial; that the trial court erred in denying his motion for a new trial; that his due process rights were violated at trial; and that the trial court erred by failing to properly authenticate a letter admitted as evidence at trial. This appeal follows.
FACTS
Late in the evening on October 31, 2010, two groups of people were in the French Quarter celebrating a New Orleans Saints football team winning a game. One group included the victim, and the other group included the defendant. At approximately 1:00 a.m. on November 1, a fight erupted in the 100 block of Bourbon Street between members of the two groups. All of the witnesses testified that the fight began between the victim, Christopher Schexnay-der (“Chris”) [1], and Robert Jenkins (“Robert”). The victim’s older brother, Lynell Schexnayder (“Lynell”), and his friend, Benny Swanigan (“Benny”), also became involved in the fight. Shots were fired leaving Chris with three gunshot wounds lying unconscious on the ground. Days later, Mr. Coleman was arrested in Georgia. He executed a waiver of extradition on November 6, 2010 and was returned to Louisiana where he was charged with the attempted second degree murder of Chris.
Following the shooting, N.O.P.D. officers arrived on the scene and detained Lynell, Benny, Robert, and Angelique Kel-son (“Angelique”). Officers also learned of four bystanders who may have witnessed the shooting.
Detective Tindell Murdock was the investigator assigned to the case. At the scene, Detective Murdock observed a pool of blood on the ground and two spent |3.40 *15 caliber Smith & Wesson shell casings. No weapons were found on the scene. Detective Murdock relocated to headquarters to obtain statements from the bystanders. He conducted a show-up identification of Robert to four bystanders. One of them identified Robert as the shooter; one said he might be; and two said he was not the shooter. No one was arrested that night for the shooting.
Lynell and Angelique both gave statements to the detective and testified at trial.[2] They both testified that they, along with Chris and Benny, had attended a party to watch the Saints game. After the game, they went to Bourbon Street where they ran into Mr. Coleman and Robert. A fight broke out between Chris and Robert. During the fight, Robert slammed Chris into the ground. Lynell and Benny jumped into the fight to defend Chris. At some point, shots were fired and Chris lay on the ground unconscious.
The night of the incident Detective Mur-dock took a taped-recorded statement from Lynell. Lynell described the shooter as being 5'9" tall, a “red” or fair-skinned African American male, who wore dreadlocks with blond tips. Lynell identified the shooter as “Terell.” He testified that he knew “Terell” from their school days and that “Terell” lived in Harvey, Louisiana. Lynell described the fight and stated that out of the corner of his eye he saw the gun in “Terell’s” hand and when he looked back, he saw his “lil brother on the ground breathing for air.” Although he did not say it on tape, after Detective Murdock concluded the recording, Lynell verified to the detective that “Terell” and the defendant, Latrell Coleman, were the same person.
14At trial, although he denied being intimidated, Lynell stated that he was not sure who fired the gun. He acknowledged that Mr. Coleman’s family was in the courtroom and that he knew of the gang 3GM.
On the night of the shooting, Angelique also gave a statement to Detective Mur-dock narrating the events of the night. Her statement was consistent with Ly-nell’s statement. However, Angelique testified that before the fight began, she saw Mr. Coleman holding a gun. Angelique watched Mr. Coleman shoot the victim three times. Mr. Coleman stood about two feet from the victim and shot him as he lay on the ground. She also stated that the victim remained conscious until after the second shot. After the shooting, everyone ran, including Mr. Coleman. She identified Mr. Coleman by name as the shooter.
Detective Murdock compiled a six-person photographic lineup which he presented to both Lynell and Angelique. When he showed it to Lynell, Lynell began to cry, put the lineup down and did not identify anyone. Detective Murdock noted that the lineup contained a picture of Mr. Coleman. Angelique picked Mr. Coleman out from the photo lineup and testified that she was 100% certain of her identification.
On the basis of Angelique’s identification, Detective Murdock obtained an arrest warrant for Mr. Coleman and a warrant to search his residence located at 2305 East-mere Drive in Harvey. The search of Mr. Coleman’s room in the Eastmere residence produced a black gun case for a .40 caliber Smith & Wesson fifteen-shot gun and an empty box of Monarch .40 caliber bullets. There was no gun in the gun case, only a cleaning brush.
Initially, Detective Murdock was unable to interview the victim, Chris, as he was in *16 a coma. About two weeks after the shooting, Detective Murdock | .^interviewed Chris in the hospital, and he identified Mr. Coleman as the man who shot him. Chris also selected Mr. Coleman from the six-person photo lineup Detective Murdock presented to him. Chris was unable to memorialize his identification of Mr. Coleman by signing the back of the lineup because the shooting left him partially paralyzed. However, Chris’ mother attested on the back of the lineup that Chris had identified Mr. Coleman as his assailant.
At trial, Chris’s testimony was consistent with the testimony of Lynell and Angelique about the events leading up to and including the fight. Chris testified that he noticed the defendant with friends, Robert and Jarell Jessee (“Jarell”) on Bourbon Street. At some point, a fight broke out. He and Robert began fighting. Chris fell, and Robert got up. Lynell and Benny then began to fight with Robert. Chris then witnessed Jarell hand Mr. Coleman a gun which Mr. Coleman used to shoot him three times as he lay on the ground. Chris identified Mr. Coleman as the man who shot him.
Mr. Coleman’s father, Giovanni Johnson (“Giovanni”), testified that his son told him that he was going to Bourbon Street on the night of October 31, 2010. He did not see him again until he was captured in Georgia. Giovanni identified several family members and friends seated in the courtroom. When questioned about a gang by the name of 3G, he stated that he had heard of them but did not know where they operated.
Jameelah Lewis (“Jameelah”) testified that she was familiar with Chris and Mr. Coleman. She knew Chris from the neighborhood and she knew Mr. Coleman from middle school. She was not on Bourbon Street at the time of the shooting. However, she testified that she received a letter from Mr. Coleman in January 2011 while he was incarcerated awaiting trial. Jameelah confirmed that her mother | (¡contacted Detective Murdock when she received this letter. Jameelah identified the letter, noting that it bore the defendant’s name, folder number, location and his address at the Orleans Parish jail. Jameelah read the letter in which Mr. Coleman asked her to supply the police with false information, i.e., that he was not the shooter.
Sgt. James Tyler, who worked in the Special Operations Division of the Orleans Parish Sheriffs Office, testified that as an inmate arrives at the Orleans Parish jail, he is given a folder number which follows him through the jail system. A folder number is unique to each inmate. Sgt. Tyler identified the letter to Jameelah as bearing Mr. Coleman’s name and folder number.
Mr. Coleman testified on his own behalf. He stated that he did not shoot the victim and did not know who did. He admitted that he was on Bourbon Street on the night of the shooting, but said he did not see the actual shooting. He claimed that he went to Georgia to escape the violence. Mr. Coleman explained that the gun box the police confiscated from his bedroom belonged to his mother. He stated that he found it in the garage of their residence; that it was empty when he found it; and that he used it to store hair clippers. He could not explain how the empty ammunition box got into his room. He verified that he wrote the letter identified by Jam-eelah, but said he did so because he was frightened and did not know what he was doing.
ERRORS PATENT
A review for errors patent on the face of the record reveals two.
*17 First, the trial judge sentenced Mr. Coleman immediately after denying his motion for new trial. Louisiana Code of Criminal Procedure article 873 mandates a twenty-four hour delay before a sentence can be imposed after the denial of a 17motion for a new trial or a post-verdict judgment of acquittal absent a waiver of the delay. However, as per State v. Collins, 584 So.2d 356, 359 (La.App. 4th Cir.1991), the failure to observe the twenty-four-hour delay mandated by Louisiana Code of Criminal Procedure article 873 is harmless where, as in this case, the defendant does not complain of his sentence on appeal. See also State v. Riley, 2005-1311, p. 4 (La.App. 4 Cir. 9/20/06), 941 So.2d 618, 621; State v. Wheeler, 2004-0953, p. 9 (La.App. 4 Cir.3/9/05), 899 So.2d 84, 89.
Second, the minute entry of Mr. Coleman’s sentencing does not indicate that his sentence is to be served without benefit of parole, probation, or suspension of sentence as is required by Louisiana Revised Statute 14:27(D)(1)(a). However, the transcript does. When there is a discrepancy between a minute entry and the transcript, the transcript prevails. State v. Bridges, 2011-1666, p. 2 n. 2 (La.App. 4 Cir. 11/28/12), 104 So.3d 657, 659, citing State v. Lynch, 441 So.2d 732, 734 (La.1983).
Therefore, the case is remanded to the district court for correction of the minute entry to reflect that the sentence is to be served without benefit of parole, probation, or suspension of sentence.
ASSIGNMENTS OF ERROR
Mr. Coleman raises five assignments of error:
1. The evidence is insufficient to uphold his conviction.
2. The trial court erred in denying his motion for a mistrial.
3. The trial court erred in denying his motion for a new trial.
4. His due process rights were violated at trial.
5. The trial court erred by failing to properly authenticate a letter purportedly written by Mr. Coleman and introduced as evidence at trial.
| «SUFFICIENCY OF EVIDENCE
In this assignment of error, Mr. Coleman challenges the sufficiency of the evidence supporting his conviction. Mr. Coleman does not dispute that the victim was shot, but claims that the State produced insufficient evidence to prove his identity as the perpetrator.
When the issues on appeal pertain to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992).
Pursuant to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in evaluating whether evidence is constitutionally sufficient to support a conviction, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. State v. Green, 588 So.2d 757, 758 (La.App. 4th Cir.1991). If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. Id. Notably, an appellate court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992). The testimony of a single witness, if believed by the trier of fact, is sufficient to support a *18 conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996. When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable | ^probability of misidentification. State v. Weary, 2003-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311.
Mr. Coleman was convicted of attempted second degree murder. Second degree murder is defined, in pertinent part, as “the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1(A)(1). A person is guilty of an attempt to commit an offense if, having a specific intent to commit a crime, he does an act for the purpose of and tending directly toward the accomplishing of his object, and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A).
To obtain a conviction for attempted second degree murder the State must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim’s death. La. R.S. 14:27; 14:30.1; State v. Bishop, 2001-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437; State ex rel. G.B., 2007-1577, p. 4 (La.App. 4 Cir. 5/14/08), 985 So.2d 828, 830. Attempted second degree murder requires proof of specific intent to kill. Bishop, 2001-2548 at p. 4, 835 So.2d at 437; State v. Johnson, 2008-1488, p. 10 (La.App. 4 Cir. 2/10/10), 33 So.3d 328, 334. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Bishop, 2001-2548 at p. 4, 835 So.2d at 437. Specific intent can be formed in an instant. State v. Cousan, 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390; State v. Sartain, 2008-0266, p. 27 (La.App. 4 Cir. 12/30/08), 2 So.3d 1132, 1148.
Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill. State v. Brown, 2003-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18.
_]_lflIn this case, Angelique testified that she was standing within five to ten feet of the victim at the time of the shooting. She unequivocally identified Mr. Coleman as the shooter. The victim also positively identified Mr. Coleman as the man who shot him. Finally, the State introduced the recording of a statement Lynell made on the evening of the shooting. While Lynell testified at trial that he did not know who shot Chris, he identified Mr. Coleman as the shooter in this statement.
The State also provided evidence of Mr. Coleman’s specific intent to kill the victim. Chillingly, the victim testified that as he lay helpless on the ground, Mr. Coleman stood over him, looked him in the eyes and shot him three times. The victim’s injuries have left him partially paralyzed and his cognitive skills are severely impaired.
In addition to the eyewitness identifications of Mr. Coleman as the shooter, circumstantial evidence lends further support to his guilt. Within hours of the shooting, the police recovered a .40 caliber Smith & Wesson gun case, an empty ammunition box and one .40 caliber bullet from Mr. Coleman’s bedroom. The shell casings gathered from the scene of the *19 shooting were of the same caliber as the ammunition seized during the search of Mr. Coleman’s bedroom. During his testimony, Mr. Coleman admitted that he fled to Georgia after the incident on Bourbon Street. His father testified that after the night of October 31, 2010, he did not see his son again until the authorities returned him to New Orleans from Georgia. “Evidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which a jury may infer guilt.” State v. Davies, 350 So.2d 586, 588 (La.1977).
| ^Finally, the letter written to Jameelah by Mr. Coleman while he was incarcerated on this charge belies his claim of innocence. Though Mr. Coleman does not admit guilt in the letter, he instructs Jamee-lah how to provide him with a false alibi, which is as good as an admission of guilt. See State v. Graves, 301 So.2d 864, 866 (La.1974) (“... an attempt to fabricate evidence is receivable in a criminal prosecution as evidence of one’s guilt of the main facts charged, such fabrication being in the nature of an admission.”)
Accordingly, the record before us established the State proved Mr. Coleman’s identity as the shooter beyond a reasonable doubt. Moreover, the State established the statutory requisites to support a conviction for attempted second degree murder. This assignment has no merit.
MOTION FOR MISTRIAL
In this assignment or error, Mr. Coleman argues the trial court erred by denying his request for mistrial. This motion was based on a comment made by the trial judge during the voir dire of the first jury panel. As the first potential juror introduced herself and was about to state her address, the trial judge advised her: “You don’t have to tell us your address, just what part of town. Because some of these people might follow you, you know?” No contemporaneous objection was lodged by the defense. Nor did the defense request an admonition. The defense did not object to the judge’s remark until the end of the first day of trial, conceding: “[w]e did not object to it [the comment] at the time but I believe we have to.”
| i?This motion for a mistrial does not fall within the ambit of Louisiana Code of Criminal Procedure article 770 which contains grounds for mandatory mistrial.[3] Therefore, we must look to the law regarding discretionary mistrials and admonitions as set forth in Louisiana Code of Criminal Procedure article 771. This article provides, in pertinent part, that upon request of the defense or the state an admonition must be given to the jury to disregard a remark or comment made by a judge during trial or in argument within *20 the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant in the mind of the jury. It also provides for a mistrial if an admonition is not sufficient to assure the defendant a fair trial.
Mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant. State v. Leonard, 2005-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. The mere possibility of prejudice is insufficient to warrant .a mistrial. Id. “Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La.C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown.” State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768.
[ mAs defense counsel neither objected to the judge’s comment nor requested an admonition in a timely fashion, this issue has not been preserved for appellate review. Louisiana’s contemporaneous objection rule provides “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” La.C.Cr.P. art. 841(A); State v. Knott, 2005-2252, p. 2 (La.5/5/06), 928 So.2d 534, 535. The contemporaneous objection rule has two purposes: (1) to require counsel to call an error to the judge’s attention at a time when the judge may correct the error; and (2) to prevent defense counsel from “sitting on” an error and gambling unsuccessfully on the verdict, and later resorting to appeal on an error that might have been corrected at trial. Id., 2005-2252 at p. 2, 928 So.2d at 535.
Nevertheless, even assuming the issue had been preserved for appellate review, there was no error in the denial of the motion for mistrial.
To determine whether a mistrial was warranted under article 771, we must first determine whether the remark was prejudicial to the defendant and second whether the defense requested an admonition. La.C.Cr.P. art 771. We find that the remark was not prejudicial and that the defense did not request an admonition. The trial judge explained that the remark did not refer to anyone making a threat, just that: “Anybody might follow somebody home.” Nor did the comment infer or imply the judge’s opinion as to the defendant’s innocence or guilt, which if it did, would require reversal. See State v. Green, 231 La. 1058, 1064, 93 So.2d 657, 659 (1957). To constitute reversible error the effect of an improper comment must have influenced the jury or contributed to the verdict. State v. Johnson, 438 So.2d 1091, 1102 (La.1983).
| ^Throughout the voir dire, both parties emphasized that the jury was to consider the evidence presented at trial and the law as they were instructed by the trial court. At the conclusion of the impaneling of the jury, all of the jurors chosen affirmed that they would remain unbiased and fair during the trial and in their decision-making process. The defense has failed to establish that the verdict in this case was influenced by the judge’s comment. Moreover, the defense did not request an admonition concerning the comment. The trial judge did not abuse his discretion in denying the motion for a mistrial. This assignment has no merit.
MOTION FOR NEW TRIAL
In his next assignment or error, Mr. Coleman argues the trial court erred in denying his motion for new trial. Specifically, he claims the trial court erred by allowing the State to suggest that Mr. Coleman was part of the 3G gang. Mr. *21 Coleman contends that the reference to gang activity was irrelevant, prejudicial, and a violation of Louisiana Code of Evidence article 404(B), which prohibits the use of evidence of other crimes or bad acts to prove bad character of the defendant and to show he acted in conformity therewith. Mr. Coleman also asserts that the trial court erred when it allowed the State to call his father as a witness allegedly for the sole purpose of accusing the father of threatening witnesses.
Louisiana Code of Criminal Procedure article 851(2) provides that the motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded. The court, on motion of the defendant, shall grant a new trial whenever the court’s ruling on an objection made during the proceedings shows prejudicial error.
11sThe decision on a motion for new trial rests within the sound discretion of the trial judge, and its ruling will not be disturbed on appeal absent a clear showing of abuse. State v. Quimby, 419 So.2d 951, 960 (La.1982). The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. As a general rule, a motion for new trial will be denied unless injustice has been done. State v. Cox, 2010-2072 (La.11/19/10), 48 So.3d 275.
We first address Mr. Coleman’s assertion that the trial court erred when it allowed the State to call his father as a witness. Mr. Coleman asserts that the only basis for calling his father was to accuse his father of threatening witnesses. We disagree.
Mr. Coleman’s father’s testimony was relevant and probative. His father testified that his son was living with him on the night of the shooting, that his son told him he was going to Bourbon Street that night, and that his son did not return home after the shooting. His father’s testimony also confirmed that the defendant fled New Orleans after the shooting. This testimony was clearly relevant to the proceedings.
Mr. Coleman’s second basis for a mistrial was the State’s continuous references to gang activity on the part of Mr. Coleman when there was no evidence to support those inferences in the record.
During trial, the State asked Mr. Coleman’s father and the victim’s brother, Ly-nell, if they were familiar with the “3G” or “3 GM” gang. Each responded that they were familiar with the gang but denied that either they or the defendant were involved with it. The gun box found in Mr. Coleman’s bedroom when his home | lfiwas searched by police contained the letters “3G” on it. This box was introduced into evidence.
During closing argument, the State attempted to explain Lynell’s change in his testimony at trial from the recorded statement he gave the police the night of the shooting by insinuating it was due to gang intimidation. Although in his recorded statement Lynell said he was positive he saw Mr. Coleman shoot the victim, at trial, he waivered, testifying that he was not certain he saw Mr. Coleman shoot the victim. In closing statement, the prosecutor reminded the jury of the empty .40 caliber Smith & Wesson gun box bearing the letters “3G” and the .40 caliber bullet, both of which were seized during the search of Mr. Coleman’s bedroom.[4] The defense lodged an objection which was overruled, and then asked for a mistrial stating that the reference was “inap *22 propriate.” This was also overruled. The prosecutor went on to argue that Lynell identified Mr. Coleman as the shooter “... before he realized that half of 3G would be in the audience.” Again, the defense moved for a mistrial which was again overruled. At this point, the judge admonished the State “Enough references to BG, sir.”
The State’s reference to “half of 3G” being in the audience without any evidence that the members of the audience were involved in the gang was, no doubt, improper. However, we find that the court properly admonished the State and any error was harmless.
The erroneous admission of evidence is subject to harmless error analysis. State v. Hugle, 2011-1121, p. 19 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 613, citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). An error is harmless if it can be said beyond a reasonable doubt that the li7guilty verdict rendered in the case was surely unattributable to that error. State v. Robertson, 2006-1537, p. 9 (La.1/16/08), 988 So.2d 166,172.
The evidence of the defendant’s guilt is overwhelming. He was identified as the shooter by the victim and two eyewitnesses. The defendant fled the state immediately after the shooting and attempted to have a friend fabricate an alibi for him. The evidence found in the defendant’s home links him to the crime. In light of the evidence, the verdict was not the result of references to gang activity. This assignment has no merit.
DUE PROCESS
In this assignment, Mr. Coleman argues that his due process rights were violated in two respects: (1) by the judge posing questions to witnesses during the trial and (2) by restricting the cross-examination of Detective Murdock.
Questioning by the judge
Louisiana Code of Criminal Procedure article 772 provides, “[t]he judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.”
This no-judge-comment rule is designed to safeguard the role of the jury as the sole judge of the facts on the issue of guilt or innocence. State v. Hodgeson, 305 So.2d 421, 430 (La.1974). Thus, if the effect of a comment is to permit a reasonable inference that it expresses or implies the judge’s opinion as to the defendant’s innocence or guilt, this constitutes a violation of the defendant’s statutory right to no-comment and thus requires reversal. See State v. Green, 231 La. 1058, 93 So.2d 657 (1957). To constitute reversible error, however, the effect |1sof the improper comment must be such as to have influenced the jury and contributed to the verdict. State v. Johnson, 438 So.2d 1091, 1102 (La.1983). A trial judge may ask clarifying questions but must be cautious in questioning a witness, so as not to imply comment on the facts. La.C.Cr.P. art. 772; State v. Burrell, 561 So.2d 692, 702 (La.1990).
The three instances which Mr. Coleman cites as impermissible comment on the evidence occurred during direct and cross-examination of Detective Murdock. As the following examination shows, the judge’s questions were for purposes of clarification, and none of the questions expressed or implied the judge’s opinion as to Mr. Coleman’s innocence or guilt.
The first instance Mr. Coleman cites occurred during Detective Murdock’s direct testimony relative to Lynell’s identi *23 fication of Mr. Coleman from a photo lineup:
Witness: When [Schexnayder] turned the lineup over he viewed it ... he immediately became upset ... He didn’t even attempt to make an identification ....
Prosecutor: ... at this time we would offer, file and introduce State’s Exhibit 4. We’d like to publish this to the jury now, if possible, just this one lineup.
Judge: Was there ever an identification made?
Witness: Yes, sir.
Judge: Go through that part first because I haven’t heard that.
The prosecutor got ahead of himself in the order of presentation of the evidence, in that he was seeking to offer an exhibit into evidence and publish it to the jury which prompted the judge to seek clarification for the jury as to whether Lynell had identified Mr. Coleman as the shooter from the lineup. The judge’s question was one prompting the State to lay the proper foundation. While a judge |19should be cautious in this regard, we cannot say that the question was a comment on the facts. It clearly did not express or imply the judge’s opinion as to innocence or guilt. The question was not an impermissible comment on the evidence.
The second instance complained of by the defense also occurred during Detective Murdock’s testimony, this time as to the victim’s identification of Mr. Coleman from a photo lineup. This lineup was conducted while the victim was hospitalized. Due to his injury-induced motor and speech impediments, the victim’s mother was present to give a written attestation to the victim’s identification of Mr. Coleman from the photo lineup.
Prosecutor: And Detective, when he pointed to Latrell Coleman, did he appear certain in his identification? Witness: Absolutely.
Prosecutor: Did he appear to have any doubt that the shooter was Latrell Coleman?
Witness: No.
Prosecutor: May I approach?
Judge: You may. How did he identify Mr. Coleman?
Witness: He pointed to him.
Although defense counsel objected to the judge asking a question, this clearly was a question of clarification by the judge due to the victim’s physical limitations.
The third instance of complaint stemmed from defense counsel’s attempt to establish that Lynell’s recorded statement taken by Detective Murdock did not contain a clarification that the person Ly-nell identified was in fact Latrell Coleman.
Defense Counsel: And can you review this document [State’s Exhibit 6] and show me anywhere in that transcription that you did, where it says or the question is Terell Latrell Coleman, where you cleared this up with Mr. Lynell Schexnayder?
^Witness: That was asked after the statement was concluded. Latrell Coleman had already been named as a suspect. This statement was taken just before the lineup was shown to him. Judge: So it’s not in there, correct? Witness: No, sir.
As the foregoing exchange shows, the judge’s question confirmed the exact point the defense wanted to emphasize to the jury.
Later, outside the presence of the jury in response to the defense’s objection to the court questioning witnesses, the judge *24 offered the State and the defense his reason for asking the questions:
... the ... questions [the court] asked it simply did not understand the particular use of pronounce (sic) which is always a problem in [this courtroom]. This, that, him, they. And I think that was the context in which the court asked the question.
In any event, none of the judge’s questions complained of by the defense amounted to impermissible comments on the evidence. Nor did the questions express the judge’s opinion as to the guilt or innocence of the defendant. This portion of the assignment of error has no merit.
Limitation of Cross Examination of Detective Murdock
Mr. Coleman claims the trial court erred by unjustifiably limiting its cross-examination of Detective Murdock as to the identification of another person as the shooter. This issue has no merit. The defense was well aware, prior to trial, that the only way it could establish that another person had been identified as the shooter was to call the witnesses who made the identification. The defense was further aware that to elicit this testimony from Officer Murdock would result in impermissible hearsay testimony.
121 At a motions hearing prior to trial, Detective Murdock testified that Robert, who participated in the fight prior to the shooting, was identified during a show-up identification by one person as the shooter and by another as possibly the shooter. Mr. Coleman claims his due process rights to a fair trial and to put on a defense were violated by his inability to present this evidence to the jury. He claims that had the jury been aware of Robert’s identification as the shooter by persons having no connection to the victim or the defendant, the verdict would have been different.
Prior to trial, the State asked the court to restrict the defense’s questions regarding this show-up identification. The following colloquy took place before the court whereby the State and the defense agreed that neither party could elicit from Detective Murdock any hearsay statements by any witnesses regarding this show-up identification:
Prosecutor: Judge, the only motion we have was discussed with [defense counsel] while we were here last week. During the course of that investigation, the detective met with four laypersons who were on the street at the time of the shooting, conducted a show-up identification procedure with those four witnesses regarding a person by the name of Robert Jenkins. We ask that unless the defense intends to call any of those four witnesses that the specific contents of what each of those four witnesses said deemed obviously hearsay and not admissible.
Defense Counsel: We understand the rules of evidence and we know what hearsay is. However, we believe that the officer can testify that they did have a suspect that he conducted a show-up with, we obviously can’t elicit anything that these individuals told the detective, but he can say what he did.
Judge: I think all three of us hopefully agree on that. Prosecutor: I agree.
Judge: I agree and you agree, so that’s done.
Prosecutor: Questions about was a show-up conducted would not be contents of the show-up.
Judge: Agreed
|aaAt trial, defense counsel was allowed to question Detective Murdock about the fact that a show-up identification of Robert was conducted with four witnesses at the police station immediately following the shooting. The State did not object to that line of questioning. However, when the *25 defense asked whether Robert was identified by one of the witnesses as the shooter, the State objected and the court properly sustained the objection as it called for hearsay. See, La. C.E. art. 801(C).
The assignment is without merit.
AUTHENTICATION OF LETTER
In his final assignment of error, Mr. Coleman argues he was prejudiced by the trial court’s admission of unauthenticated evidence. The evidence Mr. Coleman complains of is a jailhouse letter written to Jameelah requesting that she and others fabricate an alibi for him.
Authentication of evidence is a condition precedent to admissibility; an exhibit that is not authenticated does not constitute competent evidence. See La. C.E. art. 901. “Authentication” is a process whereby something is shown to be what it purports to be. Malloy v. Vanwinkle, 94-2060 (La.App. 4 Cir. 9/28/95), 662 So.2d 96, 100. Louisiana Code of Evidence article 901(B) includes a nonexclusive list of methods that may be utilized to authenticate evidence, including testimony of a witness with knowledge; non-expert opinion as to the genuineness of handwriting based on familiarity; and comparison with specimens that have been authenticated.
In this ease, the testimony of Jam-eelah and Sgt. James Tyler authenticated the “alibi” letter. Jameelah was shown the letter and identified it as being the one she received from Mr. Coleman. She identified the return address on the letter as 12,-jbeing “Latrell Colemen 2274647, OPP B1C2 3000 Perdido Street, New Orleans, La. 70119.”
Sgt. Tyler of the Orleans Parish Sheriff Office testified concerning the requirements for outgoing inmate mail. In addition to his name in the return address, an inmate must include his unique folder number, his location in OPP by tier and cell number, and the Orleans Parish Prison address of 3000 Perdido Street. Sgt. Tyler testified that he researched the defendant’s location history and folder number while he was incarcerated and verified that that the information he retrieved was the same as that contained in the return address of the letter addressed to Jameelah.
Additionally, we note that the content of the letter further supported that it was written by Mr. Coleman. The letter contained information-names of witnesses at the scene, specifics of the fight and shooting-that only a person who had been present at the scene would have known.
Considering the foregoing, the trial court did not err by finding that the “alibi” letter was properly authenticated. This assignment has no merit.
CONCLUSION
For the foregoing reasons, we affirm the conviction and sentence of Mr. Coleman. However, we remand the case to the district court with instructions to correct the minute entry to comply with the transcript and reflect that the sentence is to be served without benefit of parole, probation, or suspension of sentence.
CONVICTION AND SENTENCE AFFIRMED; REMANDED TO CORRECT MINUTE ENTRY.

. The bill of information spells the victim’s name with a “K," but all briefing in the record spell it with a "C."

. Benny did not give a statement to the police nor did he testify at trial.

. Louisiana Code of Criminal Procedure article 770 provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1)Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

. The casings found at the shooting scene were from .40 caliber bullets.